**Elke DUNLAP, Plaintiff,**

v.

**State of KANSAS, DEPARTMENT OF HEALTH & ENVIRONMENT, Defendant.**

**Case No. 00–4185–RDR.**

United States District Court, D. Kansas.

July 31, 2002.

Pantaleon Florez, Jr., Topeka, KS, for Plaintiff.

M. J. Willoughby, Scott B. Poor, Office of Attorney General, Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

Plaintiff, a German-born female who is a naturalized citizen of the United States, asserts discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Specifically, she claims

that during the course of her employment with the State of Kansas she has (1) been subjected to a hostile work environment; (2) received disparate treatment in the terms and conditions of her employment; and (3) been retaliated against by her supervisor for filing a complaint with the Kansas Human Rights Commission ("KHRC"). Presently before the court is defendant's motion for summary judgment in which defendant asserts that it is entitled to summary judgment on each of plaintiff's claims. For the reasons stated below, the court grants defendant's motion.

In considering the defendant's motion for summary judgment, the court must view all the evidence in the light most favorable to the plaintiff. *MacDonald v. Eastern Wyo. Mental Health Ctr.* 941 F.2d 1115, 1117 (10th Cir.1991). Under Fed. R.Civ.P. 56(c), summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." The initial burden is on the moving party to demonstrate that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden can be met by showing that there is insufficient evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. Once this burden has been met, the burden shifts over to the party resisting the motion to show that there is a genuine issue of material fact. *Id.* The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. The nonmoving party "may not rest upon the mere allegations or denials of his plead-

ings" to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

## BACKGROUND

The following facts are either uncontroverted or viewed in the light most favorable to the plaintiff. Facts that are immaterial have been omitted.

Plaintiff has been employed by the State of Kansas, and more specifically, the Kansas Department of Health and Environment ("KDHE") since October 28, 1992. On October 15, 1997, plaintiff began working in the Office of Information Systems at Forbes Field. Initially, she was supervised by Jim Green. Later in March or April of 1998, Phil Breedlove replaced Jim Green as plaintiff's supervisor. Many of the events which plaintiff complains of occurred while she was under Breedlove's supervision.

### The "Mocking" of Female KDHE Employees

According to plaintiff, in May of 1998 she began overhearing Breedlove "make fun" of female KDHE employees who spoke with accents. More specifically, plaintiff alleges that Breedlove would gather with co-workers after computer classes that he taught and use a Spanish accent to mimic unintelligent questions that had been asked by female students during class. Plaintiff claims that initially she tried to ignore the mocking, but after she "got sick and tired of it" she approached Breedlove on several occasions and requested him to stop. In her deposition, plaintiff stated, "I told him I didn't think that [it] was nice and that I spoke with an accent, you know, and it didn't feel good

when you hear that people make fun of you...." Plt's Depo. at 19:20–24.

When, despite plaintiff's efforts, the mocking did not stop, plaintiff claims that she then complained to Breedlove's supervisor, Pam Tierce. Plaintiff also vaguely testified during her deposition that she telephoned the Personnel Department of KDHE to complain about Breedlove's conduct. According to plaintiff, no action was taken by anyone at KDHE, including Tierce, to correct Breedlove's conduct.

Plaintiff claims that she continued to overhear the mocking until her work station was moved in April 1999 to a location from which she could no longer hear the mocking. The frequency of the mocking is not clear from reading the plaintiff's deposition. She vaguely estimated that the mocking would occur at least weekly and in some cases three times a day, but "it depended on how often he would have a foreigner in his class...." Plt's Depo. at 178:24–25.

Plaintiff has never heard Breedlove mimic a German accent, nor has she ever heard Breedlove make any derogatory comments concerning people of German ancestry or national origin. Plaintiff does claim, however, that Breedlove would sometimes amuse himself by pretending not to understand her accent in order to force her to repeat words that she had a hard time pronouncing.

**The Cowboy Hat Incident**

Sometime in February 1999, Barry Greis, a high-level employee known for wearing cowboy hats, left KDHE. On February 26, 1999, Tierce and Breedlove saw a cowboy hat on plaintiff's work station with an attached note which read "RIP." Both Tierce and Breedlove interpreted the hat

and accompanying note to be a symbol of celebration of Greis's departure from KDHE. Plaintiff was not present at work the day the RIP sign appeared on the cowboy hat and denies all involvement with placing the note on the hat. Plaintiff, however, does not deny that the cowboy hat had been at her work station for about a week prior to the incident.

Tierce, while Breedlove was present, called and reported the incident to Craig Peterson in KDHE Personnel. Breedlove claims that the fact that plaintiff was not at work that day was communicated to Peterson. Although it is not clear what actions the KDHE Personnel Office subsequently took, on March 2, 1999, plaintiff received a letter of reprimand [1] from the Secretary of KDHE, Clyde Graeber, regarding the cowboy hat. In this letter, Secretary Graeber stated that he viewed the cowboy hat as an "outward demonstration" that was "disrespectful to [his] office" and a demonstration that "cause[d] undue disruption to the workplace." Plt's Ex. 2. The letter of reprimand was not placed in plaintiff's official personnel file.

The plaintiff believes that because Breedlove knew the cowboy hat did not belong to her and that she was not present at work the day the note appeared on the hat, he must have lied to the Secretary's Office about plaintiff's involvement with the cowboy hat. Plaintiff further contends that she received disparate treatment with regard to the cowboy hat incident. Specifically, she insists that an American-born male employee, Lynn Moon, the owner of the cowboy hat found at plaintiff's work station, and two American-born female receptionists, who in April 1999 had a cowboy hat with a RIP notation in their office,

---

1. Plaintiff vigorously argues that this letter was a "letter of reprimand" while the defendant with equal vigor contends that the letter was only a "letter of concern." The court, however, concludes that the distinction is unimportant to this case.

should have also received letters of reprimand from Secretary Graeber.

### The Leave Slip Incident

On June 22, 1999, plaintiff placed a leave slip in Breedlove's in-box because she was late returning to work after lunch due to road construction. According to plaintiff, when Breedlove later questioned her about the leave request, he appeared to be extremely agitated, his hands were shaking and, although he did not raise his voice, he was so upset that she became scared. Despite plaintiff's complaints over the way Breedlove handled the matter, she admits that Breedlove ultimately approved the leave slip. It is uncontroverted that under KDHE policy, leave approval is at the discretion of the supervisor.

### Requests for Leave/Rearranged Time

Plaintiff also claims that she received disparate treatment with respect to requesting leave time and rearranged time because of her gender and national origin. To support this proposition, plaintiff cites two examples. First, she claims that a male employee, Jake Haney, whose ferret died, was freely granted two days sick leave for the pet's funeral. In contrast, plaintiff argues, when she requested leave to care for her ill husband, she was questioned about the need for leave. Second, plaintiff refers to an incident with Pam Tierce after Tierce replaced Breedlove as plaintiff's supervisor. According to plaintiff, on one occasion that she was late to work due to traffic, Tierce denied her the option to use rearranged time and made her fill out a leave slip. In contrast, she claims that males were frequently allowed rearranged time; "they got away with anything they wanted to." Plt's Depo. 491:9–10.

### Retaliation for Filing Complaints

On March 22, 1999, plaintiff filed a charge with the Kansas Human Rights Commission ("KHRC"). She complained to the KHRC that Breedlove was engaged in the mocking of females of different ancestry than his own and that she had been harassed and discriminated against based upon her gender and German ancestry with regard to the cowboy hat incident.

After the filing of the charge, plaintiff alleges that Breedlove began to engage in retaliatory conduct. Plaintiff cites the leave slip incident described above. Plaintiff also claims that Breedlove began taking away some of her job responsibilities. She also believes that Breedlove was attempting to silently demote her from an Office Assistant IV to an Office Assistant II position through a job description he drafted for her which in plaintiff's opinion reflected the duties of an Office Assistant II. Lastly, she notes that Breedlove made approximately five requests to have plaintiff removed from his supervision because of the complaint she had filed with the KHRC.[2]

On August 19, 1999, plaintiff filed an amended charge with the KHRC. In this charge, while she added two additional instances of discriminatory treatment, she again only asserted discrimination based upon sex and ancestry and did not assert that she had been subjected to any retaliatory conduct. Ultimately, on April 17, 2000 the KHRC found no probable cause to credit her allegations.

### Physical and Mental Distress

Plaintiff claims that she suffered physical and mental distress manifested by anx-

---

**2.** Although plaintiff in her brief opposing summary judgment now insists that her transfer from the Office of Information Systems at Forbes Field to the Vital Statistics Depart-ment is further evidence of retaliation, plaintiff is barred from raising this issue because she failed to raise it in the Pretrial Order. Fed.R.Civ.P. 16(e).

iety attacks, depressions, headaches, crying spells, diarrhea, vomiting, feeling like she was going to have a heart attack, and periods where she would shake uncontrollably. Although she cannot pinpoint the onset of physical symptoms, she claims that "it all got out of hand after the [cowboy hat] letter from the Secretary." Plt's Depo. at 558:7–8.

## DISCUSSION

### Hostile Work Environment Claim

 Plaintiff asserts that she was faced with a hostile work environment in violation of Title VII. To support a prima facie case of a hostile work environment, the plaintiff must demonstrate that the "work place is permeated with discriminatory intimidation, ridicule, and insult that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21–22, 114 S.Ct. 367. In determining whether an environment is hostile or abusive the court must look at all the circumstances. *Id.* at 23, 114 S.Ct. 367. These may include:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-be-

ing is relevant to determining whether the plaintiff actually found the environment abusive.

*Id.* at 23, 114 S.Ct. 367. "[N]o single factor is required." *Id.*

In *Bolden v. PRC Inc.,* 43 F.3d 545 (10th Cir.1994), an analytical framework was provided for determining whether a plaintiff had presented sufficient evidence to demonstrate a genuine issue of material fact in dispute. The plaintiff in Bolden was required to show, based upon the totality of the circumstances, that: "(1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and (2) the harassment was racial or stemmed from racial animus." *Id.* at 551. Accordingly, in this case, we must determine whether the alleged conduct was (1) pervasive or severe enough to alter the terms, conditions, or privileges of employment; and (2) whether the evidence demonstrates that the acts complained of were gender or national origin based.

 After viewing the facts in the light most favorable to the plaintiff, we conclude that plaintiff has not established a prima facie case for hostile work environment discrimination under Title VII because she has not demonstrated that defendant's conduct would not have occurred but for her gender or national origin. Any harassment of an employee "that would not occur but for the sex [or national origin] of the employee ... may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII." *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987). But "[i]f the nature of an employee's environment, however unpleasant, is *not due to her gender* [or national origin], she has *not* been the victim of sex [or national origin] discrimination as a result of that environment." *Gross v. Burggraf Constr. Co.,* 53 F.3d

1531, 1537 (10th Cir.1995) (emphasis in original) (quoting *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994)). In other words, general harassment if not based on sex or national origin is not actionable.

Plaintiff cites numerous incidents in support of her hostile work environment claim: Breedlove's use of a Spanish accent to mock unintelligent questions asked by females in his computer class, the manner in which the cowboy hat incident was handled, the leave slip incident, the several occasions on which Breedlove would amuse himself by pretending not to understand plaintiff's accent in order to force her to repeat words that she had a hard time pronouncing, Breedlove's requests to have plaintiff removed from his supervision, and Breedlove's removal of some of her duties. The problem with plaintiff's claim, however, is that with the exception of the incidents where Breedlove would pretend not to understand plaintiff's accent, she has not demonstrated the existence of any conduct that targets her gender or German origin. And the few incidents where Breedlove allegedly would amuse himself by pretending not to understand plaintiff's accent are acts that are simply not severe or pervasive enough to create an objectively hostile or abusive work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (stating that " 'simple teasing,' offhand comments, and isolated incidents ... unless extremely serious ... will not amount to discriminatory changes in the 'terms and conditions of employment.' ") (internal citations omitted).

The cowboy hat incident that plaintiff complains of does not demonstrate that plaintiff's gender or national origin was being targeted. Plaintiff complains that she received a letter of reprimand from Secretary Graeber because Breedlove lied to the Personnel Office about her involvement with the cowboy hat. Even if Breedlove lied about plaintiff's involvement, she has not demonstrated that he did so as a result of any discriminatory bias as opposed to mere dislike of the plaintiff. Similarly, the leave slip incident evinces no inference of discrimination. A supervisor can question a supervisee about her use of leave. Furthermore, the record shows that Breedlove ultimately approved the leave slip. As for Breedlove's requests to have plaintiff removed from his supervision, plaintiff has not shown that these requests were made with any discriminatory intent rather than simply because he wished to distance himself from plaintiff after she had filed a charge against him with the KHRC. With regard to Breedlove's removal of some of plaintiff's duties, it is uncontroverted that the only duties removed from her were either given to a newly-hired assistant or assumed by Breedlove himself. The plaintiff did not suffer a salary reduction, demotion or any other negative employment action as a result of having some of her duties removed. Lastly, we address the mocking incidents that plaintiff's hostile work environment claim rests almost exclusively upon. While these incidents were allegedly quite frequent, sometimes up to three times a day, as with the other incidents plaintiff complains of, these incidents do not target plaintiff's gender or national origin. Plaintiff would ask this court to find a hostile work environment based on incidents that target people who speak with accents generally. While in an appropriate case mimicking of accents could serve as indirect evidence of discrimination, because plaintiff's own accent, German, was not being mimicked, and because the mocking was not in any way directed at her, the causal link is simply too weak to give rise to an inference that plaintiff's German ancestry or gender was somehow being targeted.

As the record indicates, plaintiff was never included in the conversations in which the alleged mocking would occur; she would only overhear Breedlove engage in the mocking with co-workers. Similarly, while it appears that the computer questions that were being joked about always came from females, Breedlove never made disparaging remarks about females in general.

While plaintiff's mental and physical symptoms suggest that she may have perceived her working environment to be hostile, because the record is devoid of evidence of severe or pervasive conduct that targets her national origin or gender, plaintiff's hostile work environment claim fails as a matter of law.

### Disparate Treatment Claim

█ Plaintiff also claims that she received disparate treatment in the terms and conditions of her employment in violation of Title VII. To establish a prima facie case of disparate treatment on account of her gender and national origin, plaintiff must show: (1) that she is a member of a protected class by virtue of her gender (female) and by virtue of her German ancestry; (2) that she was subjected to adverse employment action; (3) that there was disparity in the treatment afforded her in the terms and conditions of her employment as compared to that of similarly situated employees who are non-members of the protected class; and (4) that the defendant had no legitimate non-discriminatory reason for the allegedly disparate treatment, or that the stated reasons are pretextual. See *Robinette v. National Credit Services Corp.*, 182 F.Supp.2d 1055, 1061 (D.Kan.2001) (citing *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1380 (10 th Cir.1994)).

█ The Tenth Circuit liberally defines the phrase "adverse employment action" and takes a "case-by-case approach" in determining whether certain actions constitute adverse employment actions. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir.1998); *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998). Nevertheless, "a mere inconvenience or an alteration of job responsibilities" does not constitute adverse employment action. *Sanchez*, 164 F.3d at 532 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). The Supreme Court has stated that conduct is adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). These examples provided in Burlington make clear that for employment action to be considered "adverse" it must have a significant impact on the plaintiff's employment status or benefits.

█ Plaintiff asserts that the letter of reprimand she received from Secretary Graeber regarding the cowboy hat incident was a consequence of disparate treatment premised on her gender and national origin. To support this contention, plaintiff argues that an American-born male employee of KDHE, Lynn Moon, the owner of the cowboy hat found at plaintiff's work station, and two American-born female receptionists, who in April 1999 had a cowboy hat with a RIP notation in their office, should have also received a letter of reprimand from Secretary Graeber. This claim fails, however, because we conclude that a letter of reprimand standing alone cannot constitute adverse employment action. Absent adverse employment action, plaintiff cannot establish a prima facie case of disparate treatment under Title VII. *Robi-*

*nette,* 182 F.Supp.2d 1055, 1061 (D.Kan. 2001) (citing *Robleado v. Deffenbaugh Indus., Inc.,* 136 F.Supp.2d 1179, 1190 (D.Kan.2001)).

While the 10th Circuit has stated no general rule regarding letters of reprimand, the Seventh Circuit Court of Appeals stated in *Krause v. City of La Crosse,* 246 F.3d 995, 1000 (7th Cir.2001) (internal citations and quotations omitted) (emphasis in original):

 With regard to [plaintiff's] claim that the letter of reprimand constituted an adverse job action, the plaintiff-appellant ignores firmly established circuit precedent that a letter of reprimand is not an adverse job action *unless the letter is accompanied by some other action, such as job loss or demotion.* This circuit already has concluded that negative performance evaluations standing alone, cannot constitute an adverse employment action. . . .

Judge Van Bebber of this court has reached a similar conclusion. *Robleado,* 136 F.Supp.2d at 1179 (concluding that negative performance write-ups that were not placed in employee's personnel file and did not result in any disciplinary action did not constitute adverse employment action). We find the foregoing authority persuasive, and accordingly, conclude that because the letter of reprimand was not placed in plaintiff's personnel file and because plaintiff suffered no negative consequences in her employment as a result of the letter, the letter does not constitute adverse employment action.

 Plaintiff further asserts that she received disparate treatment with respect to her use of leave time and rearranged time. Plaintiff's claim again fails for the same reason. The court is convinced that being questioned about the use of leave time and being denied the use of rearranged time are simply employment decisions which are too trivial to rise to the level of adverse employment action. Other courts have found transfer and scheduling decisions of more significance than plaintiff's claim here to be insufficient to constitute adverse employment action. See *Amro v. Boeing Co.,* 232 F.3d 790, 797 (10th Cir.) (holding that mere delay in obtaining a desired transfer does not constitute an adverse employment action); *Neratko v. Frank,* 31 F.Supp.2d 270, 288–89 (W.D.N.Y.1998) (concluding that plaintiff's allegation of discriminatory scheduling with regard to assigning work hours on holidays and afternoons could not constitute adverse employment action absent any loss of privilege, responsibility, or opportunity); *Moss v. Advance Circuits, Inc.,* 981 F.Supp. 1239, 1246 (D.Minn.1997) (holding that scheduling inconveniences do not qualify as discriminatory adverse employment). Furthermore, it is uncontroverted that decisions granting or denying an employee use of leave or rearranged time are employment decisions that lie wholly within the discretion of the supervisor. "A [supervisor's] . . . decision is not adverse employment action just because the employee dislikes it or disagrees with it." *Fortner v. State of Kansas,* 934 F.Supp. 1252, 1267 (D.Kan.1996). We grant summary judgment to defendant on plaintiff's claims of disparate treatment under Title VII.

### Retaliation Claim

Lastly, plaintiff claims that she was subjected to various acts of retaliation for filing a charge with the KHRC. Defendant contends, however, that plaintiff is barred from raising any claims of retaliation for failure to exhaust administrative remedies. We agree.

 Generally, exhaustion of administrative remedies is a jurisdictional prerequisite to bringing suit under Title

**1344**

VII. *Jones v. Runyon,* 91 F.3d 1398, 1399 (10th Cir.1996). To exhaust administrative remedies, the plaintiff must present her claims to the Equal Employment Opportunity Commission ("EEOC") or local discrimination agency. See *Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Services,* 165 F.3d 1321, 1326 (10th Cir.1999). Thus, normally, an employee may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge. *Id.* The administrative exhaustion requirement functions: 1) to give notice of the alleged violation to the charged party; and 2) to give the EEOC or local discrimination agency an opportunity to conciliate the claim. *Ingels v. Thiokol Corporation,* 42 F.3d 616, 625 (10th Cir.1994). The Tenth Circuit, however, has recognized a narrow exception to this rule and allows a plaintiff to seek judicial relief for incidents not listed in the original charge to the EEOC or local discrimination agency if such incidents are 'like or reasonably related to the allegations of the [EEOC] charge.' *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 799 (10th Cir.1997) (quoting *Brown v. Hartshorne Pub. Sch. Dist. # 1,* 864 F.2d 680, 682 (10th Cir.1988)). The Tenth Circuit has further held that 'an act committed by an employer in retaliation for filing of an EEOC complaint is reasonably related to that complaint, obviating the need for a second EEOC complaint.' *Ingels,* 42 F.3d 616, 625 (10th Cir.1994) (quoting Brown, 864 F.2d at 682)).

While plaintiff cites this proposition in Ingels to support her contention that she need not have submitted her retaliation claims in her amended charge to the KHRC before asserting them here in this judicial proceeding, plaintiff's reliance on Ingels is misplaced. The plaintiff ignores the fact that the plaintiff in Ingels was claiming retaliation based upon events that occurred after the filing of a judicial action. *Id.* at 625 n. 7. In contrast, here, plaintiff is alleging retaliation for events that occurred before she filed her amended charge with the KHRC and before she filed this lawsuit. It was clear in Ingels that the court allowed the plaintiff to pursue his retaliation claim to avoid placing on him the burden of filing an additional lawsuit. See *Id.* As the Ingels court stated, 'Indeed, requiring a plaintiff to file a second EEOC charge under these circumstances could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination.' *Id.* (quoting *Butts v. City of New York Dep't of Housing Preservation & Dev.,* 990 F.2d 1397, 1403 (2nd Cir.1993)). In our view, plaintiff's case is more analogous to the facts of *Seymore,* 111 F.3d 794. As was explained in Seymore:

> Where an alleged retaliatory action occurs after the filing of a charge with the [EEOC], the retaliatory action is reasonably related to the charge. *However, where a retaliatory act occurs prior to the filing of a charge and the employee fails to allege the retaliatory act or a retaliation claim in the subsequent charge, the retaliatory act ordinarily will not reasonably relate to the charge.*

111 F.3d 794 at 799 (emphasis added).

In *Seymore,* the plaintiff, Ms. Seymore, had filed a complaint alleging race and sex discrimination with the Oklahoma Human Rights Commission prior to her termination. Then, five days after she was terminated, the plaintiff filed a separate charge with the EEOC again alleging race and sex discrimination. The court concluded that since plaintiff was aware of her retaliation claim at the time she filed her separate charge with the EEOC, it did not reasonably relate to her EEOC charge;

and thus, the court lacked subject matter jurisdiction over her claim. The court stated:

> Ms. Seymour was aware of her retaliation claim at that time, and had the opportunity to assert that claim on her EEOC charge, thus giving Defendants notice of the claim and providing the EEOC the opportunity to attempt to conciliate the claim. However she chose not to do so. Because the EEOC complaint was filed after the termination, we believe the defendants, as well as the EEOC were entitled to presume Ms. Seymore was only asserting claims for race and sex discrimination. If we were to allow Ms. Seymore to rely on her earlier Human Rights' Commission complaint to assert a claim of retaliation, we would be acting in blatant disregard of the dual purposes of the EEOC charge requirement.

*Seymore*, 111 F.3d 794 at 800.

The case at bar presents an analogous situation. On March 22, 1999, plaintiff filed a charge with the KHRC alleging gender and national origin discrimination. Then the alleged retaliation occurred. According to plaintiff, Breedlove began to eliminate her duties and responsibilities, subjected her to verbal harassment over the leave slip, and sought to be removed from her supervision. As the record indicates, Breedlove's supervision of plaintiff ended in July of 1999. On August 19, 1999, plaintiff filed an amended charge with the KHRC. In this charge, while she added two additional instances of discriminatory treatment, she again asserted discrimination based only upon sex and ancestry, and did not assert any retaliatory conduct. Plaintiff had the opportunity in her August 19, 1999 charge to allege any retaliatory conduct but chose not to do so. Neither the KHRC nor KDHE were put on notice that plaintiff might raise any claims of retaliation in this lawsuit. Accordingly, this court shall grant this aspect of defendant's motion for summary judgment.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Doc. # 78) be granted. Judgment shall be entered for the defendant on all claims and against the plaintiff.

**IT IS SO ORDERED.**