Wei–Kang ZHOU, Plaintiff,

v.

**PITTSBURG STATE UNIVERSITY, Defendant.**

**No. CIV.A.01–2493 KHV.**

United States District Court, D. Kansas.

March 24, 2003.

Mark A. Buchanan, Sanders, Simpson, Fletcher & Smith, L.C., Kansas City, MO, for plaintiff.

Kyle M. Fleming, Garry W. Lassman, Wilbert & Towner, P.A., Pittsburg, PA, for defendant.

### *MEMORANDUM AND ORDER*

VRATIL, District Judge.

Wei–Kang Zhou filed suit against his former employer, Pittsburg State University ("PSU"), for breach of contract and discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.* On January 29, 2003, based on plaintiff's failure to attend three scheduled depositions, the Court ordered plaintiff to pay all expenses and attorneys' fees which defendant incurred because of his discovery misconduct. *See Memorandum And Order* (Doc. # 114) at 11–13. This matter is before the Court on plaintiff's *Motion For Relief, Motion For Reconsider, [And] Motion For Sanction* (Doc. # 117) filed February 12, 2003; defendant's *Motion For Attorney Fees And Memorandum In Support* (Doc. # 121) filed February 21, 2003; defendant's *Motion For Summary Judgment And Memorandum In Support* (Doc. # 119) filed February 20, 2003; and plaintiff's *Motion For Extension Of Time* (Doc. # 130) filed March 6, 2003. For reasons set forth below, the Court sustains defendant's summary judgment motion in part, sustains plaintiff's motion to reconsider in part, overrules plaintiff's motion for sanctions and sustains plaintiff's motion for an extension of time.

## I. Plaintiff's Motion For Relief And To Reconsider

### A. *Legal Standards*

The Court has discretion whether to grant a motion to reconsider. *See Hancock v. City of Okla. City,* 857 F.2d 1394, 1395 (10th Cir.1988). The Court may recognize any one of three grounds justifying reconsideration: an intervening change in controlling law, availability of new evidence, or the need to correct clear error or prevent manifest injustice. *See Major v. Benton,* 647 F.2d 110, 112 (10th Cir.1981); *Burnett v. W. Res., Inc.,* 929 F.Supp. 1349, 1360 (D.Kan.1996). A motion to reconsider is not a second opportunity for the losing party to make its strongest case, to rehash arguments, or to dress up arguments that previously failed. *See Voelkel v. Gen. Motors Corp.,* 846 F.Supp. 1482, 1483 (D.Kan.), *aff'd,* 43 F.3d 1484, 1994 WL 708220 (10th Cir.1994). Such motions are not appropriate if the movant only wants the Court to revisit issues already addressed or to hear new arguments or supporting facts that could have been presented originally. *See Van Skiver v. United States,* 952 F.2d 1241, 1243 (10th Cir.1991), *cert. denied,* 506 U.S. 828, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992).

The Court affords a *pro se* plaintiff some leniency and must liberally construe the complaint. *See Oltremari v. Kan. Soc. & Rehab. Servs.*, 871 F.Supp. 1331, 1333 (D.Kan.1994). While *pro se* complaints are held to less stringent standards than pleadings drafted by lawyers, *pro se* litigants must follow the same procedural rules as other litigants. *See Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir.1992), *cert. denied*, 507 U.S. 940, 113 S.Ct. 1336, 122 L.Ed.2d 720 (1993). The Court may not assume the role of advocate for a *pro se* litigant. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991).

### B. *Factual Background*

On May 17, 2002, the Court entered a scheduling order which directed that all discovery be commenced or served in time to be completed by October 31, 2002. *See Scheduling Order* (Doc. # 10) at 3. On September 18, 2002, plaintiff asked the Court to continue the discovery deadline to January 29, 2003. *See Motion For Continuing The Discovery Cut-off Date* (Doc. # 55). Plaintiff argued that the extension was necessary because he did not receive his EEOC investigation file until September 4, 2002.[1] Based on the fact that eight weeks remained for discovery when plaintiff received the EEOC file, Magistrate Judge David J. Waxse ruled that plaintiff had not shown good cause for a three-month extension of the discovery deadline. *See Order* (Doc. # 69) filed October 9, 2002.

On September 6, 2002, defense counsel noticed plaintiff's deposition for October 1 in Pittsburg, Kansas. *See Notice Of Taking Deposition* (Doc. # 53) filed September 9, 2002. On September 26, plaintiff faxed a letter to defense counsel, objecting to the location of the deposition. *See Exhibit 4 to defendant's Motion To Compel Discovery And Memorandum In Support Thereof* (Doc. # 63) filed October 2, 2002. Plaintiff requested that defense counsel take his deposition near Los Angeles, California (where plaintiff resides), and notified counsel that he preferred to communicate by mail instead of telephone. *See id.* On October 2, defendant filed a motion to compel plaintiff to appear in Kansas for his deposition. On October 30, Judge Waxse held a hearing on defendant's motion but overruled it as moot because plaintiff had agreed to come to Kansas City for his deposition. *See Order* (Doc. # 78) filed November 1, 2002 at 1. Judge Waxse also extended the discovery deadline from October 31 to November 29. *See id.* at 2.

Although the place for plaintiff's deposition was thus agreed, the parties could not agree on a date for plaintiff's deposition. Therefore, on November 15, defense counsel noticed plaintiff's deposition for November 26 in Lenexa, Kansas (a suburb of Kansas City). *See Notice Of Deposition*, attached as Exhibit 5 to defendant's *Motion To Dismiss And Memorandum In Support* (Doc. # 88) filed December 12, 2002. Plaintiff received the notice by mail on November 18. *See Exhibit 6 to Motion To Dismiss* (Doc. # 88). On November 20, plaintiff faxed defense counsel a letter stating that he would fly to Kansas City for the deposition, but that three PSU administrators should travel to Kansas City so that plaintiff could take their depositions that same day. *See Exhibit EE to plaintiff's Response to Defendant's Motion To Dismiss And Memorandum In Support* (Doc. # 95) filed December 17, 2002.

---

**1.** In part, the delay was due to the fact that defendant had filed a motion for protective order to ensure that plaintiff did not reveal confidential information to non-parties. On August 14, 2002, the Court sustained defendant's motion for protective order. Plaintiff received the EEOC file shortly thereafter, on September 4, 2002. *See Order* (Doc. # 48).

Plaintiff did not propose alternative deposition dates and did not indicate how the parties could meet the discovery deadline of November 29 if the depositions did not commence on November 26. *See id.* On November 25, plaintiff faxed to defense counsel his formal response to the deposition notice. *See* Exhibit FF to plaintiff's *Response to Defendant's Motion To Dismiss And Memorandum In Support* (Doc. # 95) filed December 17, 2002. In that response, plaintiff stated that he would not appear in Kansas City for his deposition on November 26 because defendant had not agreed to produce the three PSU administrators in Kansas City for depositions on the same day. Defense counsel was traveling to Kansas City on November 25, so he did not receive plaintiff's fax. Therefore, on November 26, he appeared for plaintiff's deposition. Plaintiff, as promised, did not appear.

On November 29, plaintiff filed a motion to compel and extend the discovery deadline. *See* plaintiff's *Motion To Compel And Motion For Continuing The Discovery Cutoff Date* (Doc. # 83). Plaintiff asked the Court to (1) require PSU administrators to appear in Kansas City for depositions; and (2) extend the discovery deadline to January 13, 2003. *See id.* at 8–11.[2]

On December 11, 2002, Judge Waxse held a pretrial conference which addressed plaintiff's motion to compel and the preparation of a pretrial order.[3] Judge Waxse overruled plaintiff's motion to require PSU administrators to be deposed in Kansas City, but he extended the discovery deadline to December 26. *See Order* (Doc. # 90) filed December 12, 2002. Immediately after the pretrial conference on December 11, defense counsel called plaintiff and talked to him briefly about sending a fax.[4] *See* Exhibit 1 to defendant's *Reply To Plaintiff's Response to Defendant's Supplemental Memorandum in Support Of Motion To Dismiss* (Doc. # 111) filed January 14, 2003. Later on December 11, defense counsel sent plaintiff a letter, asking plaintiff to contact him so that they could schedule dates for plaintiff's deposition in Kansas City and for depositions of PSU administrators in Pittsburg, Kansas. *See* Exhibit 1 to defendant's *Reply To Plaintiff's Response And Supplemental Memorandum In Support Of Motion To Dismiss* (Doc. # 105) filed December 31, 2002. On December 16, plaintiff faxed a letter to defense counsel explaining that he would not respond to defendant's request because he did not yet have a copy of Judge Waxse's order or the district court's order on his appeal of Judge Waxse's order. *See* Exhibit 1 to plaintiff's *Response To Defendant's Supplemental Memorandum In Support Of Motion To Dismiss* (Doc. # 108) filed January 8, 2003. On December 16, defense counsel noticed plaintiff's deposition for December 23.[5] *See* Notice Of Deposition, attached as Exhibit 2 to defendant's *Reply To Plaintiff's*

2. Plaintiff also asked the Court to compel defendant to produce certain information which is not relevant for purposes of plaintiff's motion to reconsider.

3. No official record of the telephone hearing has been transcribed. The Court has relied on the certified audio recording of the hearing.

4. Defense counsel states that plaintiff hung up during the telephone call. Plaintiff denies that he hung up, but telephone records for

defense counsel reflect that shortly after the first telephone call ended, defense counsel called back and placed a total of seven additional calls to plaintiff that day. The telephone records reflect that defense counsel made repeated efforts to contact plaintiff on December 11.

5. Defense counsel states that he also left a voice mail message for plaintiff explaining that unless plaintiff responded by the end of the day, he was going to notice plaintiff's deposition for December 23 in the Kansas

*Response And Supplemental Memorandum In Support Of Motion To Dismiss* (Doc. #105) filed December 31, 2002. Defense counsel sent the deposition notice to plaintiff by certified mail. The U.S. Postal Service attempted to deliver that notice to plaintiff on December 19, but plaintiff was not at his residence. The Postal Service left a notice which stated that plaintiff could pick up a certified letter from PSU after 9:00 a.m. on December 20.

On December 19, this Court affirmed Judge Waxse's rulings on plaintiff's motion to compel. *See Memorandum & Order* (Doc. #97). As to the depositions of PSU administrators, the Court stated:

> Judge Waxse ordered that any depositions of PSU administrators must occur in Pittsburg, Kansas, where they work. Plaintiff argues that because he resides in Los Angeles, California and defendant has a Kansas City satellite location which is close to a major airport, the Court should require PSU administrators to appear in Kansas City. *See Motion For Review* at 2–3; *Motion To Compel* at 8–9. Absent exceptional or unusual circumstances, when a deponent resides at a substantial distance from the deposing party's residence, the deposing party is required to take the deposition where the deponent resides, even if the deponent is a party. *Metrex Research Corp. v. United States,* 151 F.R.D. 122, 125 (D.Colo.1993); *see Moore v. Pyrotech Corp.,* 137 F.R.D. 356, 357 (D.Kan.1991) (citing 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure; Civil* § 2103, at 374–75 (2d

ed.1970)). The record does not reflect where the PSU administrators reside, but they work in Pittsburg, Kansas— some 120 miles from Kansas City, Kansas. Judge Waxse's ruling that plaintiff must depose defendant's administrators in Pittsburg, Kansas is not clearly erroneous.

*Id.* at 4–5. As to the extension of the discovery deadline, the Court affirmed Judge Waxse's ruling that all discovery be completed by December 26. *See id.* at 8. On December 12, defendant had filed a motion to dismiss based on plaintiff's failure to cooperate in discovery and comply with a court order relating to his deposition. *See Motion To Dismiss And Memorandum In Support* (Doc. #88) filed December 12, 2002. Although defendant's motion was not ready for ruling at the time of its order, the Court noted that it would "not tolerate any further delay of plaintiff's deposition." *Memorandum & Order* (Doc. #97) at 9. The Court also cautioned: **"If plaintiff again fails to appear for his deposition by the court-imposed deadline, the Court likely will impose sanctions, up to and including dismissal of the case with prejudice.** The filing of further objections or motions on this issue will not operate to extend or stay the deadline." *Id.* (emphasis in original). The next morning, December 20, the Clerk faxed to plaintiff and defense counsel a copy of the court order.

On December 20, in a telephone conference with plaintiff, defense counsel agreed to depose plaintiff on December 26 and to have Dr. Tom Bryant, PSU President, available for deposition that same day.[6]

City area. Plaintiff denies that defense counsel left such a message, but telephone records for defense counsel confirm that he called plaintiff on December 16 and that the call lasted 40 seconds.

**6.** The telephone conversation took place shortly after plaintiff had faxed to defense

counsel deposition notices for Dr. Bryant, Dr. Robert Ratzlaff (PSU Vice President) and Dr. Orville Brill (former Dean of the College of Arts and Sciences). The following are excerpts of the telephone conversation:

> Defense counsel: Dr. Bryant will be the only administrator available. * * * *

On December 23, however, defense counsel appeared for plaintiff's deposition in Lenexa, Kansas and plaintiff failed to appear.

On January 29, 2003, based on plaintiff's failure to attend three scheduled depositions, the Court ordered plaintiff to pay all expenses and attorneys' fees which defendant incurred because of his misconduct. *See id.* at 11–13. Plaintiff seeks reconsideration of that ruling.

### C. *Analysis*

 Plaintiff argues that the Court should not have sanctioned him for failing to attend his deposition on December 23 because on December 20, defense counsel agreed to take plaintiff's deposition on December 26. To support his contention, plaintiff has presented a written transcript of a tape recorded conversation between plaintiff and defense counsel on December 20.

Defendant argues that the transcript is inadmissible because plaintiff tape recorded the telephone conversation in violation of California law. Plaintiff argues that he did not violate California law because one party to the conversation (plaintiff) consented to the recording. Under the California Penal Code, a party cannot record a confidential communication "without the consent of all parties" to the communication and such illegal recordings are inadmissible in any judicial proceeding. Cal.Penal Code § 632. Therefore plaintiff probably violated state law by recording the telephone conversation without defense counsel consent. *See Flanagan v. Flanagan*, 27 Cal.4th 766, 117 Cal.Rptr.2d 574, 41 P.3d 575, 581–82 (2002) (statute applies to all nonconsensual recordings of telephone conversations regardless of content of conversation).

The more difficult issue is whether the tape recording of the telephone conversation should be excluded in federal court where, as here, the federal court has subject matter jurisdiction because of a federal question. *See Pretrial Order* (Doc. # 103) filed December 23, 2002 at 1. The Ninth Circuit recently addressed the conflict between California Penal Code § 632 and federal law, which permits the recording of private conversations if the recording is not made for the purpose of committing a criminal or tortious act. *See Feldman v. Allstate Ins. Co.*, 322 F.3d 660 (9th Cir.2003); *see also* 18 U.S.C. § 2511(2)(d) (party to communication may intercept communication except for pur-

---

Plaintiff: I did not know anything. I try my best to comply with the court order and I will go there and make myself available on the 26th at your home in front of your office. What can be better than this? Nothing can be better than that at all.

Defense counsel: Fine.

Plaintiff: Anyway, I will be there in your office in Pittsburg on the 26th, OK?

Defense counsel: Well, Dr. Bryant will be available and I will be available to take your deposition. But those are the only two individuals that will be available. * * * *

Defense counsel: Dr. Zhou, I will be here and Dr. Bryant will be here for his deposition on Thursday, December 26. There is no other administrator that I can guarantee will be here.... And I sent you a letter on December 11th stating please contact me so we can schedule as soon as possible, and you have continued to ignore it.

Exhibit TB to plaintiff's *Motion For Relief, Motion For Reconsider, [And] Motion For Sanction* (Doc. # 117) filed February 12, 2003.

As to plaintiff's deposition notices of Dr. Bryant, Dr. Ratzlaff and Dr. Brill, Judge Waxse ruled that the notices were procedurally defective for failure to include the dates, times or locations of the depositions and that the notices did not provide reasonable notice of the depositions. *See Order* (Doc. # 101) at 2–3. Plaintiff appealed Judge Waxse's ruling, but the Court affirmed it. *See Memorandum And Order* (Doc. # 114) filed January 29, 2003 at 11–13.

pose of committing criminal or tortious act). The Ninth Circuit held that under *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), Section 632 of the California Penal Code constitutes substantive law and should be enforced in diversity cases. *See Feldman,* 322 F.3d 660, 666–67. The Ninth Circuit noted that in non-diversity cases, however, evidence obtained in contravention of state law is admissible in federal court, so long as no federal law is thereby violated. *See id.* at 665–66 (citing *United States v. Cormier,* 220 F.3d 1103, 1111 (9th Cir.2000) and *United States v. Adams,* 694 F.2d 200, 201 (9th Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3085, 77 L.Ed.2d 1347 (1983)); *see also Roberts v. Americable Int'l Inc.,* 883 F.Supp. 499, 503 (E.D.Cal. 1995). Accordingly, in this case which is based on a federal question, the tape recording of the telephone conversation on December 20 is admissible.

■ Defendant also objects that the tape recording does not include the entire telephone conversation, other telephone conversations between the parties or messages which defense counsel left on plaintiff's answering machine. Defendant cites no authority for its position that an audiotape is inadmissible unless it includes the entire conversation or all conversations during a certain time period. Here, plaintiff explains that he answered the phone and started the tape recording shortly thereafter. In these circumstances, the excerpt is not inadmissible.

■ Finally, defendant objects for lack of foundation and authentication. For purposes of a pretrial motion related to sanctions, the Court finds that plaintiff has satisfied his burden. *See* Fed.R.Evid. 901(a) (authentication requirement satisfied by evidence sufficient to support finding that matter is what proponent claims it is). Plaintiff states that the tape is a recording of a telephone conversation between himself and defense counsel on December 20. On the tape, defense counsel confirms his name and the date of the conversation. Moreover, except for its general objection to the authenticity of the tape, defendant does not argue that any portion of the tape has been altered or that the transcript does not accurately reflect the telephone conversation. In these circumstances, the Court will consider the audiotape in connection with plaintiff's motion to reconsider the award of sanctions.

Defense counsel does not deny that on December 20, in response to plaintiff's statement that he would be in Pittsburg for his deposition on December 26, defense counsel stated that he would be available to take plaintiff's deposition on that day and that Dr. Bryant would also be available. In direct contradiction of this representation, defense counsel appeared for plaintiff's deposition on December 23 in Lenexa, Kansas. Plaintiff did not appear for the deposition on December 23, apparently relying on defense counsel's statement that he would be available for plaintiff's deposition on December 26. Because plaintiff and defense counsel talked several times and/or sent several faxes during this time frame, the timing and context of defense counsel's representation is not entirely clear.[7] Moreover, until now, plaintiff has never claimed that defense counsel

7. Defense counsel apparently notified plaintiff the next day that at least as to the deposition of Dr. Bryant, he had changed his mind. During the afternoon of December 21, plaintiff received a federal express package from defense counsel which included a motion to quash the depositions of the three PSU administrators. The record does not reflect whether defense counsel informed plaintiff after the telephone conversation on December 20 that he intended to take plaintiff's deposition on December 23 pursuant to the deposition notice.

agreed to take his deposition on December 26. *See Response To Defendant's Supplemental Memorandum In Support Of Motion To Dismiss* (Doc. # 108) filed January 8, 2003; *Amend To Plaintiff's Response To Defendant's Supplemental Memorandum To Dismiss* (Doc. # 113) filed January 23, 2003. Given plaintiff's *pro se* status and the standard to justify an award of sanctions, however, the Court will construe the uncertain context of defendant's representation in plaintiff's favor. Accordingly, the Court sustains plaintiff's motion to reconsider and vacates its award of fees and expenses which defendant incurred because of plaintiff's failure to attend three scheduled depositions. *See Memorandum And Order* (Doc. # 114).[8]

## II. Plaintiff's Motion For Sanctions

 Plaintiff asks the Court to sanction defense counsel for "misconduct, lying and misrepresentation" and "non-cooperative manner" in the discovery process, and to grant plaintiff additional time to file motions, and to order defense counsel to pay plaintiff's attorney consultant fee and fees and costs for any additional court filing regarding discovery in this case. Plaintiff's *Motion For Relief, Motion For Reconsider, Motion For Sanction* (Doc. # 117) filed February 12, 2003 at 21. Plaintiff does not specify the authority for his sanctions request, but in part he argues that defense counsel's representations to the Court were false and misleading. To the extent that plaintiff seeks sanctions under Rule 11, the Court overrules his request because he did not wait 21 days after service of the request for sanctions before filing a motion with the Court. *See* Fed.R.Civ.P. 11(c)(1)(A).

 Even if plaintiff had complied with Rule 11(c)(1)(A), he is not entitled to sanctions. The Court has considerable discretion when it comes to imposing sanctions under Rule 11. *See Nat'l Hockey League v. Metro. Hockey Club. Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). In determining which sanctions should be imposed, the Court must consider the purposes to be served by the imposition of sanctions. In *White v. Gen., Motors Corp., Inc.*, 908 F.2d 675 (10th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991), the Tenth Circuit outlined those purposes as including (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management. 908 F.2d at 683. The primary goal of sanctions is to deter misconduct. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). In considering the imposition of sanctions, the Court must consider on a case-by-case basis whether a party's failure was substantially justified or whether other circumstances make the imposition of sanctions inappropriate. *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 997 (10th Cir.1977) (citing *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)).

Plaintiff first argues that defense counsel lied to the Court when he stated that he made numerous phone calls to plaintiff on December 11 and 16, to discuss plaintiff's deposition. Based on the telephone records defense counsel submitted, this

---

**8.** Pursuant to the Court's *Memorandum And Order* (Doc. # 114), defendant filed a motion for attorneys' fees and expenses. *See* defendant's *Motion For Attorney Fees And Memo-* *randum In Support* (Doc. # 121) filed February 21, 2003. In light of the above ruling, the Court overrules defendant's motion for fees and expenses as moot.

Court found that "[i]mmediately after the pretrial conference on December 11, defense counsel called plaintiff and talked to him for approximately one hour," *Memorandum And Order* (Doc. # 114) at 4, and that defense counsel made repeated efforts to contact plaintiff on December 16, *id.* at 4 n. 4. Plaintiff points out, and defense counsel concedes, that the one hour telephone call was actually the pretrial conference with Judge Waxse. The Court's order should read that immediately after the pretrial conference on December 11, defense counsel called plaintiff and talked to him briefly about sending a fax. Although defense counsel highlighted the one hour call as one made to plaintiff, his memorandum did not represent that after the pretrial conference, he talked to plaintiff for nearly one hour. The Court—not defense counsel—erroneously reached that conclusion. As to the Court's conclusion that defense counsel made repeated efforts to contact plaintiff on December 16, the context of that comment reflects that such efforts were on December 11. The reference to December 16 is therefore erroneous. These two errors had no material effect on the Court's order on sanctions.

Although defense counsel could have explained in greater detail the contents of the telephone records, his conduct does not warrant sanctions.[9]

Next, plaintiff maintains that defense counsel lied when he stated that he faxed notices of deposition to plaintiff on December 11 and December 16. In its order of January 29, 2003, the Court did not make a factual finding on this issue. Whether defense counsel sent the deposition notice by fax was not material to the Court's ruling on sanctions. Based on the record, the Court cannot determine with certainty whether defense counsel sent the deposition notice by fax. The Court will not sanction defendant based solely on plaintiff's version of the events.[10]

▮▮▮▮ Finally, plaintiff asks the Court to grant him leave to depose "the administrators and music faculty members, and to pay to the plaintiff the costs for making additional travel to Kansas for depositions." *Id.* Plaintiff's current request does not specify the names of the individuals he wants to depose or explain why plaintiff could not take their depositions before the discovery deadline.[11] To the

---

9. Plaintiff also argues that defense counsel lied when he stated that plaintiff hung up during the telephone conversation about plaintiff's deposition. In a footnote in its order on sanctions, the Court noted defense counsel's allegation, but this fact was not material to the Court's ruling on sanctions. Based on the present record, the Court cannot determine with certainty whether plaintiff hung up during a telephone conversation with defense counsel. Accordingly, sanctions against defense counsel are not warranted based on his allegation that plaintiff did so.

10. To the extent plaintiff seeks sanctions for defense counsel's statement on December 20 that he would be available to take plaintiff's deposition on December 26, the Court overrules plaintiff's request. First, plaintiff does not claim that defense counsel stated that the deposition noticed for December 23 was can-

celed. Based on the uncertain context of defense counsel's representation, as explained above, sanctions are not warranted. Moreover, because plaintiff did not travel to Kansas on December 26 and the Court has vacated its award of sanctions against plaintiff, plaintiff did not suffer substantial prejudice because of defense counsel's statement. Finally, plaintiff cites no authority for sanctions based on counsel's statements on the telephone.

11. As explained above, as to plaintiff's deposition notices of Dr. Bryant, Dr. Ratzlaff and Dr. Brill, Judge Waxse ruled that plaintiff's deposition notices were procedurally defective and did not provide reasonable notice. *See supra* note 6. Plaintiff appealed Judge Waxse's ruling, but the Court affirmed it. *See Memorandum And Order* (Doc. # 114) filed January 29, 2003 at 11–13.

extent plaintiff asks for discovery as a sanction, the Court overrules his request for the reasons set forth above. To the extent plaintiff seeks to reopen discovery, the Court notes that except for plaintiff's deposition on February 6, 2003, discovery closed on December 26, 2002. The Court has discretion whether to reopen discovery. *See SIL–FLO, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1514 (10th Cir.1990); *Smith v. United States,* 834 F.2d 166, 169 (10th Cir.1987). To determine whether to reopen discovery, the Court considers the following factors: (1) whether trial is imminent; (2) whether the request is opposed; (3) whether the non-moving party would be prejudiced; (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court; (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court; and (6) the likelihood that the discovery will lead to relevant evidence. *Id.* Each of these factors weighs against reopening discovery. First, trial is scheduled to begin in less than two weeks. Given the posture of the case—discovery has closed and defendant has filed a summary judgment motion-defendant would be prejudiced if discovery were reopened. Moreover, plaintiff had ample time during discovery to take depositions, but he did not do so. Finally, plaintiff has not shown that the depositions will likely lead to relevant evidence. Therefore the Court overrules plaintiff's request to reopen discovery.

## III. Defendant's Motion For Summary Judgment

### *Legal Standards*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden. of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The non-moving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary

judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### Plaintiff's Motion For Extension Of Time To File Opposition Brief

The Court originally ordered plaintiff to file any opposition to defendant's summary judgment motion by March 3, 2003, and allowed defendant to file a reply brief by March 7, 2003. *See Memorandum And Order* (Doc. # 114) filed January 29, 2003 at 17–18. On March 3, the Court sustained plaintiff's motion for extension of time and ordered plaintiff to file his opposition brief by March 7, with defendant to file a reply brief by March 13. *See Order* (Doc. # 125). On March 6, plaintiff filed another motion for extension of time, asking to file his opposition brief on March 11. *See* plaintiff's *Motion For Extension Of Time* (Doc. # 130) filed March 6, 2003. For good cause shown, the Court finds that plaintiff's motion for extension of time should be sustained.

 On March 19, without leave of court and without seeking an extension of its March 13 deadline, PSU filed a reply brief in support of its motion for summary judgment. *See* defendant's *Reply To Opposition For Summary Judgment* (Doc. # 138). Because defendant did not timely file its reply brief or seek an extension of time before the deadline, the Court analyzes whether PSU has shown excusable neglect. *See* D. Kan. Rule 7.4 (failure to respond within time specified constitutes waiver of right to thereafter file such re-

sponse, except upon showing of excusable neglect). The Supreme Court analyzed the excusable neglect standard in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).[12] In determining whether the excusable neglect standard is met, courts should consider all relevant circumstances, including: "(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith." *Id.* at 395, 113 S.Ct. 1489. PSU has addressed none of these factors. Because trial of this matter is scheduled in less than two weeks, the Court will not *sua sponte* find excusable neglect by PSU. PSU should have known that it had to either comply with the March 13 deadline or seek an extension of time. Accordingly, the Court disregards PSU's reply brief.

### Factual Background

For purposes of defendant's motion for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.

Plaintiff, an American citizen who was born in China, has more than 20 years experience as a music teacher. From 1979 to 1986, plaintiff taught at the Shanghai Conservatory of Music in Shanghai, China. *Declaration Of Dr. Wei–Kang Zhou* (Doc. # 133) filed March 11, 2003 ("*Plaintiff's Decl.*") ¶ 2. From 1986 through 1990, plaintiff taught music at the Houston Conservatory of Music in Houston, Texas. *Id.* ¶ 7. In 1990, plaintiff started to teach at the University of Southern California while he pursued a doctorate degree. *Id.* ¶ 8.

---

**12.** Although the *Pioneer* analysis was performed in the context of Fed. Bankr.R. 9006(b)(1), the Tenth Circuit has adopted it in other contexts as well. *See City of Chanute, Kan. v. Williams Nat'l Gas Co.,* 31 F.3d 1041, 1046 (10th Cir.1994).

Plaintiff also served as concertmaster in two professional orchestras in Los Angeles and conductor of a youth symphony. After plaintiff received his Doctor of Musical Arts degree from the University of Southern California, he went to teach at LaGrange College for the 1995–96 academic year. He also served as concertmaster of the LaGrange Symphony. *Id.* ¶¶ 5, 10. After one year, he went to Arkansas State University, where he served as string instructor and conductor of the Arkansas State University Orchestra. *Id.* ¶ 11.

In August 1997, PSU hired plaintiff as a tenure track assistant professor in the Department of Music. The vacancy notice for the position stated:

> RESPONSIBILITIES: Teach studio violin and viola to majors, minors and general students as well as courses in string pedagogy and technique. Teach courses in music theory and/or literature. Participate actively in the recruitment of students. Serve as Concertmaster of the Southeast Kansas Symphony Orchestra and perform with faculty.

Exhibit AA to *Plaintiff's Decl.* (Doc. # 133). Plaintiff understood that at PSU, he was required to serve as concertmaster of the Southeast Kansas Symphony Orchestra ("SEK Symphony") and perform with faculty. Plaintiff taught applied violin and viola, chamber music, string ensemble, string technique and music appreciation. *Plaintiff's Decl.* ¶ 17.

13. The appraisal form included five performance levels: highly satisfactory, above satisfactory, satisfactory, less than satisfactory and unsatisfactory.

14. In one portion of his declaration, plaintiff describes the "discrimination issue" as follows:

> The discrimination issue was that I would be disciplined if I missed one concert no matter how much I contributed to the Southeast Kansas Symphony and no matter

On March 1, 1999, Gene E. Vollen, Interim Chair of the Department of Music, gave plaintiff his annual performance appraisal for the calendar year 1998. The appraisal rated plaintiff's teaching and service as "above satisfactory," his scholarly activity as "highly satisfactory," and his overall performance as "above satisfactory." [13]

Later in March of 1999, plaintiff refused to participate in an SEK Symphony concert. Before he missed the concert, plaintiff told Vollen that he played the violin too much, that his hands hurt and he did not want to permanently injure them, and that he needed a rest. At a PSU music faculty meeting in March of 1999, plaintiff raised "the discrimination issue." *Plaintiff's Decl.* ¶ 19.[14] Plaintiff told other faculty members that the requirement to serve the SEK Symphony was discriminatory, "that other music faculty members received credit towards their annual performance appraisal for their participation once or twice each year in the [SEK] Symphony but I participated more than anyone else and I would be punished if I miss one concert ...; and I was never given any credit towards my workload for the weekly work plus the work on Saturdays and Sundays." *Id.* In that meeting, many faculty members stated that plaintiff's situation was not fair and one faculty member stated that plaintiff should be given credit for his work in the SEK Symphony.

> the fact that I participated in the Southeast Kansas Symphony more than anyone else in the music department; and that nobody would be disciplined for missing many or all of the Southeast Kansas Symphony concerts and that anyone would be given credit if a faculty member participated in the Southeast Kansas Symphony for one or two times except me; and that all the music faculty members were Caucasian and I was the only Chinese.

*Plaintiff's Decl.* (Doc. # 133) ¶ 28.

On May 27, 1999, Vollen gave plaintiff his second year tenure review letter. The letter generally included positive comments as to plaintiff's teaching, scholarly activity, creative endeavor and service. As to collegiality, however, the letter noted:

COLLEGIALITY: The Tenured Faculty do have serious concerns which need to be addressed and, while I am listing them under this heading, they overlap with other areas, especially Teaching and Service.

The Tenured Faculty note that in the Job Description, under which you were employed and which has not been subsequently altered, you are required to act as Concert Master of the SEK Symphony.

They also note that, beginning with the March, 1999 concert, you have refused to participate in that capacity, leaving the string students without the leadership the faculty had envisioned when they conducted the search that brought you to campus. They feel that this unilateral decision on your part, with the concurrent avoidance of proper procedure in dealing with this sort of concern, represents a violation of your obligation to live up to the position description. This has strong implications for a negative tenure decision or even notice of termination.

The Tenured Faculty are also very concerned about a lack of professional behavior which would require tact and diplomacy in public, and the avoidance of discussing colleagues with your students, and of loudly discussing material in front of others (including students) that should be discussed in private and only with the individuals involved.

The Tenured Faculty feel that you need to agree to participate with a posi-tive collegial attitude and professional behavior in order to become tenured at Pittsburg State University.

Exhibit M to *Plaintiff's Decl.* (Doc. # 133). Shortly thereafter, plaintiff talked to Dean Brill about the letter. Plaintiff stated that the university was discriminating against him. *Plaintiff's Decl.* (Doc. # 133) ¶ 23. Dean Brill stated that we need to "look into the issue why you are the only one in the music department, who is required to do the work in the [SEK] Symphony." *Id.*

In August 1999, Anne Patterson replaced Vollen as chairperson of the music department. Plaintiff talked to Patterson about the "discrimination issue" and she agreed that the symphony requirement was unfair and that plaintiff's teaching load was too heavy. *Id.* ¶ 24. Despite these comments, Patterson did not adjust plaintiff's teaching load and she asked plaintiff to play in the SEK Symphony several times during the fall semester of 1999. Plaintiff did not play in the SEK Symphony during the 1999–2000 academic year. Deposition of Plaintiff at 313, attached as Exhibit 3 to defendant's *Motion For Summary Judgment And Memorandum In Support* (Doc. # 119) filed February 20, 2003.

On March 1, 2000, Patterson gave plaintiff an annual performance appraisal for the calendar year 1999. The appraisal rated plaintiff's teaching and overall performance "less than satisfactory," and scholarly activity and service as "satisfactory." [15] As to teaching (which included recruiting), Patterson noted that plaintiff had recruited one student, Ni Mei, in violation of the Code of Ethics of the National Association of Schools of Music ("NASM"), the music department's accrediting agency.[16] Patterson also noted that when she

---

**15.** As explained above, the appraisal form included five performance levels: highly satis-factory, above satisfactory, satisfactory, less than satisfactory and unsatisfactory.

**16.** The NASM rule states that member schools

questioned plaintiff about the incident, plaintiff did not tell her the truth, which jeopardized Patterson's credibility and put the music department in a difficult position. As to scholarly activity, Patterson noted that plaintiff had played with the Memphis Symphony from January through May of 1999, but that plaintiff apparently did not request permission to do so and the activity took him away from his classes for several days throughout the semester.[17] As to service, Patterson noted that plaintiff had declined service in the SEK Symphony even after the chairperson had asked him to play in a single concert which required only two rehearsals.

Plaintiff asked Dean Brill and Patterson to review his appraisal, but they agreed with the original evaluation. On March 15, 2000, Dean Brill and Patterson recommended to Dr. Ratzlaff that no change be made to plaintiff's evaluation. That same day, plaintiff gave Dean Brill a grievance regarding his performance appraisal and asked PSU to change the rating to "above satisfactory" for each category including his overall performance.[18] Plaintiff stated:

> [Teaching] I did not know the NASM "ethic code" at the time when I made the scholarship recommendation to the music department. . . . The reason I did not want to let people know where the student came from was not because of the NASM "ethic code." I didn't know

the "code" at the time. Ni Mei studied with a violin teacher in Converse College in South Carolina, and I found that Ni-Mei's violin teacher was a friend of mine. We both studied with the same violin professor in University of Southern California in Los Angeles. We both got doctorate degree in the same school. What I was worried was that my friend would tell my former professor at University of Southern California that I stole her student if I helped the student come to PSU. * * * *

> on January 27, 2000, Anne Patterson called me with an angry tone. She said that she talked to Xiao–Guo Zhu (Xiao–Ghu is my student in PSU. She introduced Ni Mei to PSU). Anne Patterson said "Xiao–Guo told me that you knew Ni Mei. You also knew Ni Mei was attending Converse College. Ni Mei also visited PSU, and met you. Why did you tell me that you didn't kn[o]w Ni Mei and you didn't kn[o]w she was in Converse College?" I said that "I didn't tell you the truth simply because I want to save a student. Because that student will be destroyed if I don't try to save her." * * * *

> I told Anne Patterson the untruth. I apologize. * * * *

> I did tell the untruth to the chair, Anne Patterson. I feel sorry. I apologize. But it's not fair to deny all my teaching

cannot award a scholarship to a student who is already under scholarship at another member school. *Plaintiff's Decl.* (Doc. # 133) ¶ 30. PSU never informed plaintiff of the NASM rule. *Id.* NASM does not have any documentation relating to any ethical violation by PSU or its faculty.

17. Plaintiff always arranged to have his classes covered either by a substitute teacher or "by assignments." *Plaintiff's Decl.* (Doc. # 133) ¶ 27. Plaintiff does not explain what "by assignments" means. The Court assumes that plaintiff gave his students additional assignments to make up for any missed classes.

Plaintiff always followed the music department's rule regarding out-of-town performances. While plaintiff was disciplined for performing outside of Pittsburg, some faculty members who participated in the Kansas City Symphony and the Springfield Symphony received credit toward their scholarship activities for their performances. *Id.*

18. During the spring semester of 2000, plaintiff also filed a grievance regarding his teaching load, but Patterson denied it. *Plaintiff's Decl.* (Doc. # 133) ¶ 36.

and recruiting accomplishments by one incident. * * * *

[Scholarly Activity] Since I came to PSU in the Fall of 1997, I played a few times in the Memphis Symphony each semester. I was never told to get permission. . . . When Anne Patterson came in the Fall of 1999, she announced that everyone needed to fill in a form and g[e]t permission from department chair before leaving town. I have done exactly what she said.

Anne Patterson said to me that "you played in Memphis Symphony five times in the Spring Semester. At least, you missed five hours classes in that semester. You were paid for these missing classes. That's why I need [to] lower you scholarship rating." But I was asked to teach seven and half hours extra beyond the regular teaching load every week. Why did I not get any pay for doing such a heavy extra teaching work? * * * *

[Community] I did not want to play in the coming SEK Symphony concert [on December 5, 1999]. I talked to Anne Patterson, and told her the story. I said that I did not want to play the coming SEK Symphony concert because Carolann Martin was trying to destroy my reputation in the town. Anne Patterson said "I forgot you need to play that concert. This time is OK. But next time please tell me earlier." I explained to her that because Anne Patterson was out of town for a few days and the newspaper incident happened during these days, that's why I did not get a chance to talk to her. Anne Patterson said that she understood the situation that I did not get a chance to tell her earlier because of the timing. * * * * It is unfair that I was lowered [in the] service performance rating because of this incident. Also, if it was service, Anne Patterson should not force me to do it. I already have such a heavy teaching load. Why do I still have to play the SEK Symphony?

Plaintiff Depo. Exh. 5. Dean Orville Brill and Patterson denied plaintiff's request to change his performance appraisal rating.

On April 6, 2000, plaintiff filed a formal appeal regarding his 1999 performance appraisal with Dr. Bryant. Plaintiff stated:

I believe there is a discrimination issue here. There were rumors that there were at least seven faculty members from the music department who had their 1999 performance appraisal ratings corrected by Dean Brill. I have worked very hard and contributed a lot to the music department but my 1999 appraisal was not corrected. I would like to be treated equally as everyone else in the music department.

Exhibit P-a to *Plaintiff's Decl.* (Doc. # 133). On April 26, 2000, Bryant denied plaintiff's appeal. Bryant noted that plaintiff's "less than satisfactory" rating had a rational basis.

In 1999, all the appraisal ratings for music faculty members were higher than plaintiff's rating. In plaintiff's opinion, however, he had contributed more than anyone else in the music department that year. Also, many faculty members who received higher ratings than plaintiff were still not satisfied. When these faculty members resubmitted their appraisals, each one received an even higher rating.

On April 28, 2000, Patterson arranged a student recital which originally was scheduled to last a maximum of 42 minutes. Students signed up for the recital and listed the length of the pieces they were going to perform. Based on the sign-up sheet, the estimated length of the program was 56 minutes. Patterson did not cut any students from the program, but she put two of plaintiff's students at the end of the recital. After the recital ran over time,

Patterson sent plaintiff a memorandum which explained in part:

> Last Tuesday's recital, as you know, *far* exceeded the time limits of the class, with the result that the choir, which has a concert coming soon, lost a substantial amount of its rehearsal time. The fact that your timing of Xiao Guo Zhu's and NiMei's pieces was not even close to the actual length of these movements made it impossible to plan this recital hour accurately. Xiao Guo's performance took almost 15 minutes (you had listed 8 on the sign-up sheet), and Ni Mei's took 18 minutes (you had listed 10 on the sign-up sheet).
>
> When you were asked [to] make cuts so that we could accommodate the many students who needed performance time, you refused, stating that your students needed to perform these works in public, in preparation for a competition. I was sympathetic to their need to perform these works before a live audience, and attempted to ensure that the recital, though long, would not run over-time. Had I known then that you had not accurately timed these pieces (they needed almost double the time you allotted), we could have avoided the serious conflict with choir time.

Exhibit W to *Plaintiff's Decl.* (Doc. # 133). The students, not plaintiff, had provided the time estimates for their pieces. *Plaintiff's Decl.* (Doc. # 133) ¶ 37. None of the other teachers of students in the recital received similar memoranda from Patterson. *Id.*

On May 2, 2000, Patterson sent Dr. Ratzlaff a letter which recommended that PSU issue plaintiff a terminal contract for the 2000–01 academic year. Patterson noted as follows:

> That the tenured members of the department of music have had serious concerns about Dr. Zhou's work in the department is clear in his second year letter. Serious issues of collegiality and professional judgment were raised then. I have to say that, although he and Dr. Carolann Martin have resolved some of the issues between them which were so problematic last year (perhaps because they now have little to do with one another), I believe that other serious issues remain. * * * *
>
> It is extremely important that I be able to depend upon what a faculty member tells me to be true. Dr. Zhou has made a habit of telling me untruths in important situations. I find that I can no longer trust his word. He seems unwilling or unable to learn procedures. After the terrible uproar over NiMei's scholarship, I find that he has offered a scholarship to an incoming student, *without* having discussed the offer with Dr. Martin, his colleague in the strings area, or with me, as departmental policy prescribes. * * * *
>
> His teaching record this year has been marred [with] his recruiting "irregularities" and the series of lies he offered concerning these irregularities. His scholarly effort is extremely limited: The recordings that he cites in his annual report are CDs which he burned himself. His playing in Memphis was, unfortunately, apparently praised in years past. This year it has come to light that he made no effort to see that his classes were covered during these monthly trips to Tennessee, for which he was paid. * * * *
>
> I believe that retaining Wei–Kang Zhou is not in the best interest of the Department of Music. In a department that places high value upon collegiality and mutual effort toward common goals, Dr. Zhou is not a good match. His time here has been marked by discord and controversy.

Exhibit CC to *Plaintiff's Decl.* (Doc. # 133).

On May 9, 2000, the president of the PSU chapter of the Kansas National Education Association ("PSU/KNEA") notified Bryant and plaintiff that the executive committee of PSU/KNEA had approved advisory arbitration as to plaintiff's 1999 performance appraisal.[19] Exhibit R to *Plaintiff's Decl.* (Doc. # 133).

On May 15, 2000, Bryant notified plaintiff that as recommended by the Chair of the Department of Music, in consultation with the Dean of the College of Arts and Sciences, PSU would not continue his employment beyond May 12, 2001. PSU gave plaintiff a contract to teach in the music department for the 2000–01 academic year. The PSU Unclassified Personnel Handbook states that those faculty members who have been employed with PSU for two or more years are entitled to one year's notice that they will not be reappointed.

Plaintiff resigned his PSU position on June 27, 2000 and he accepted a position at Southern Utah University for the 2000–01 academic year.

From August 1997 through June 2000, plaintiff was the only member of the music faculty who was born in China; all other faculty members were Caucasian.

Plaintiff does not know if he was subject to discrimination, or treated differently than other faculty members during the 1997–98 academic year. Plaintiff's Depo. at 101–02, 104. Plaintiff does not recall any discriminatory remarks at PSU. *Id.* at

101, 151. According to plaintiff, people are not so foolish today to make such remarks. *Id.* at 101, 151.

Plaintiff did not file a formal complaint of discrimination with the PSU Equal Employment Opportunity director, but plaintiff raised the "discrimination issue" at a faculty meeting in March of 1999, at a meeting with Dean Brill shortly after the second year tenure review letter in May of 1999, at a meeting with Patterson in August of 1999, in grievances filed with Bryant and Brill in March and April of 2000, and in a grievance regarding his teaching load, which he filed with Patterson in the spring of 2000.

Plaintiff's teaching accomplishments are outstanding. *Plaintiff's Decl.* (Doc. # 133) ¶ 3. Many former students are now professional musicians in the United States. *Id.* During his three years at PSU, plaintiff had the heaviest workload of any faculty member in the music department. *Id.* ¶ 18. As explained above, PSU required plaintiff to serve as concertmaster for the SEK Symphony, but it did not ask any other faculty member to do likewise. *Id.* During his three years at PSU, plaintiff received very good student evaluations. *Id.* ¶ 15. Plaintiff recruited more student players for the SEK Symphony than any other faculty member. *Id.* ¶ 22.

On April 2, 2001, plaintiff testified in a deposition in a separate lawsuit that he left PSU because he found a better job. Plaintiff denied that he left PSU involuntarily because of a less than satisfactory performance rating or discrimination. In his

---

**19.** In his declaration, plaintiff refers to several statements by the PSU "teachers union." *See Plaintiff's Decl.* (Doc. # 133) ¶¶ 21, 31, 33–35. For example, plaintiff states "[t]he teacher's union said to me that [the requirement to play with the SEK Symphony] was discrimination, and strongly support[ed] my action against discrimination," *id.* ¶ 21, and that the "teachers' union also said that [my 1999 performance appraisal] was discrimina-

tion and retaliation from the PSU administration." *Id.* ¶ 31. Such statements are inadmissible because they (1) do not identify the speaker; (2) constitute hearsay, *i.e.* offered to prove that PSU discriminated and retaliated against plaintiff, and (3) constitute legal conclusions. Accordingly, the Court excludes paragraphs 21, 31 and 33 through 35 of plaintiff's declaration.

deposition in this case, however, plaintiff explained "better means different things, you know, better in teaching area, or be better in service area, or better in location, more close to Los Angeles, and there are different meanings, what do you mean. Better certainly does not include everything." Plaintiff's Depo. at 277.[20]

On October 9, 2001, plaintiff filed suit against PSU for national origin discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and breach of contract. PSU seeks summary judgment on all of plaintiff's claims. PSU argues that plaintiff's national origin was not a determining factor in its employment decisions; that plaintiff did not participate in protected activity under Title VII; that to the extent plaintiff engaged in any pro-

tected activity, it did not take adverse employment action in retaliation for such activity; and that plaintiff cannot show a breach of the employment contract or any damages with respect to his breach of contract claim.

## Analysis

### A. Disparate Treatment

 Plaintiff alleges that because of his national origin, PSU (1) gave him an heavier workload than other teachers in the Music Department, (2) gave him a negative tenure review letter in May 1999, (3) gave him a poor evaluation in March 2000 and (4) notified him in May 2000 that it would not renew his employment beyond May of 2001 because of his national origin.[21] To prevail on his claim, plaintiff

20. Both parties refer to a number of facts which are clearly irrelevant to defendant's summary judgment motion. This case involves plaintiff's tenure at PSU from August 1997 through June 2000. The reasons why plaintiff left his jobs before and after those dates are irrelevant. The Court therefore excludes evidence of why plaintiff left his positions at LaGrange Academy and Southern Utah University. Likewise, the Court excludes evidence that Patterson and plaintiff's supervisor at Southern Utah University were faculty members at the University of Central Arkansas *before Patterson came to PSU.*

Plaintiff also alleges that Patterson intentionally discriminated against a Chinese graduate student and teaching assistant while she was at the University of Central Arkansas. Plaintiff's declaration does not demonstrate that he has personal knowledge of the incident and his entire version of the story appears to be strictly hearsay. Accordingly, the Court excludes paragraph 49 of plaintiff's declaration.

21. Plaintiff has not specifically set forth his claims in his opposition brief. Liberally construing plaintiff's factual contentions and legal theories, as outlined in the pretrial order, the Court finds that these four contentions fairly capture plaintiff's disparate treatment claim. In addition to these four contentions, the factual contentions of the pretrial order allege that because of his national origin, PSU

disciplined plaintiff (1) for playing in another orchestra (the Memphis Symphony), (2) for his students running overtime at the recital in April of 2000 and (3) for missing a community orchestra concert (SEK Symphony) although he participated in the community orchestra more than anyone else. *See Pretrial Order* (Doc. # 103) filed December 23, 2002 at 3–4.

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Tenth Circuit liberally defines adverse employment action. *See Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 532 (10th Cir.1998). "Such actions are not simply limited to monetary losses in the form of wages or benefits." *Id.* Instead, the Tenth Circuit applies a "case-by-case" approach, examining the unique factors relevant to the situation before it. *Id.* Nevertheless, *adverse employment action does not include* "a mere inconvenience or an alteration of job responsibilities." *Id.* (citations and quotations omitted).

As to the incidents regarding the Memphis Symphony and the SEK Symphony, plaintiff apparently received an oral reprimand but except for the negative evaluations and non-

must establish that his national origin was a determining factor in the challenged decisions. *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir.1996) (citing *Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir.1988)). Plaintiff need not show that his national origin was the sole reason for the challenged actions, but he must show that his national origin "made the difference" in the decisions. *Greene*, 98 F.3d at 557 (quoting *EEOC v. Sperry Corp.*, 852 F.2d 503, 507 (10th Cir.1988)). He may meet this burden by direct or circumstantial evidence that his national origin was a determining factor, or by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

▇▇▇ Plaintiff has not presented direct evidence of discrimination based on national origin.[22] The Court therefore evaluates his claims under the burden-shifting framework established in *McDonnell Douglas*. To set forth a prima facie case of discrimination under *McDonnell Douglas*, plaintiff must show each of the following elements: (1) that he belongs to a

protected class; (2) that he suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances which give rise to an inference of discrimination. *See Hysten v. Burlington N. & Santa Fe R.R. Co.*, 296 F.3d 1177, 1181 (10th Cir.2002).

▇▇▇ As to plaintiff's claim related to his heavy teaching load, defendant does not dispute that an increased teaching load can constitute adverse employment action, *cf. Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir.1998) (adverse employment action does not extend to mere inconvenience or alteration of job responsibilities), but it claims that plaintiff does not have sufficient evidence that his teaching load was heavier than those of other faculty members or that the department chairperson changed the teaching load of other faculty members who had heavy loads. In his deposition, plaintiff stated that (1) he does not remember how many classes or studio hours per week he taught during the fall of 1997, (2) he does not know whether his class load was lighter or heavier in comparison to other faculty members in the fall of 1997, (3) he cannot identify any faculty member who had a heavy

renewal of his contract, as outlined above, he has not shown that he suffered negative consequences as a result of these reprimands. *See Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir.1994) (plaintiff must show adverse action relating to evaluation). Likewise, plaintiff received a written memorandum regarding his students running overtime at a recital, but he has not shown adverse action because of this memorandum. *See Dunlap v. Kan. Dept. of Health & Env't*, 211 F.Supp.2d 1334, 1343 (D.Kan.2002) (letter of reprimand without negative consequences not adverse action). Patterson did not specifically mention the recital in her recommendation of May 2, 2002 that PSU not renew plaintiff's contract beyond the 2000–01 academic year. For these reasons, the Court will not consider separately the three disciplinary incidents outlined in plaintiff's factual contentions.

**22.** Direct evidence, though rare, consists of "proof of an existing policy which itself constitutes discrimination," *Mosley v. Pena*, 100 F.3d 1515, 1519 (10th Cir.1996), or statements which on their face show that defendant "acted on [its] discriminatory beliefs." *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1008 (10th Cir.1990), *cert. denied*, 506 U.S. 907, 113 S.Ct. 302, 121 L.Ed.2d 225 (1992); *see Carney v. Pena*, 992 F.Supp. 1285, 1290 (D.Kan.1998). "Statements which on their face are expressions of personal opinion, however, can only support an inference of discrimination if the trier of fact finds the inference reasonable, and so constitute only circumstantial or indirect evidence of discrimination against the plaintiff." *Mosley*, 100 F.3d at 1519–20 (quoting *Ramsey*, 907 F.2d at 1008).

teaching load which PSU lightened; and (4) he cannot recall his teaching load in academic year 1998–99. Plaintiff's Depo. at 90–91, 128–30. In his declaration, however, plaintiff states that during his three years of employment at PSU, he had the heaviest workload in the music department. *See Plaintiff's Decl.* (Doc. # 133) ¶¶ 18, 29. Defendant does not challenge plaintiff's competence as a witness on this issue, and it has not offered evidence to contradict plaintiff's assessment of his relative workload. Moreover, defendant does not offer a legitimate non-discriminatory reason for giving plaintiff the heaviest workload. The Court therefore overrules defendant's motion for summary judgment as to plaintiff's claim that PSU assigned him a heavy workload without additional pay because of his national origin.

As to the three other adverse employment actions outlined above, defendant does not dispute that plaintiff can demonstrate a prima facie case. Plaintiff's establishment of a prima facie case creates a presumption of unlawful discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). After plaintiff has established a prima facie case, the burden shifts to defendant to produce evidence that it took the adverse employment action for a legitimate nondiscriminatory reason. *Greene,* 98 F.3d at 558; *Randle,* 69 F.3d at 451. Defendant must articulate and produce some evidence that it took each adverse action for a "facially legitimate and nondiscriminatory reason." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 (10th Cir.1997).

Defendant does not mention the above analysis,[23] but it nevertheless has offered non-discriminatory reasons for each adverse employment action. Therefore defendant has met its burden. The presumption of discrimination therefore drops from the case and plaintiff must establish by a preponderance of the evidence "that the proffered reason was not the true reason for the employment decision." *Id.* Plaintiff may show pretext by establishing either that a discriminatory reason more likely motivated defendant or that the employer's explanations are unworthy of credence. *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994).

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted). While "[t]his burden is not onerous ... it is also not empty or perfunctory." *Id.* at 1323–24. A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir.2000). More specifically, evidence of pretext may include,

---

**23.** Indeed, in analyzing plaintiff's disparate treatment claims, defendant cites only one case. Plaintiff likewise does not mention the *McDonnell Douglas* analysis or cite any legal authority in support of his disparate treatment claims. Despite the dearth of legal analysis, the parties refer to the purported reasons for PSU's actions and whether such reasons are supported by the record. Therefore the Court has simply addressed the parties' factual arguments in the legal context of *McDonnell Douglas.*

but is not limited to, the following: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating ... criteria); and the use of subjective criteria." *Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir.1999).

■ In this case, defendant has offered multiple non-discriminatory reasons for its actions. An employee generally must proffer evidence to show that each of the employer's justifications are pretextual. *See Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir.2000). The Tenth Circuit recognizes, however, that "when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility." *Id.* In such circumstances, the jury need not believe the employer's remaining reasons. *See id.* An employee is relieved of the obligation of proving that each stated reason is pretextual only where "the multiple grounds offered by the defendant ... are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff may [prevail]." *Id.* (quoting *Wilson v. AM Gen. Corp.*, 167 F.3d 1114, 1120 (7th Cir.1999)) (further citation omitted).

### 1. Plaintiff's Second Year Tenure Review Letter Dated May 27, 1999

■ Plaintiff argues that PSU discriminated by giving him a negative tenure review letter dated May 27, 1999. Defendant's stated reasons for giving plaintiff the negative evaluation are: (1) beginning with the concert in March of 1999, plaintiff refused to participate as concertmaster of the SEK Symphony, which was a requirement of his position and (2) plaintiff exhibited unprofessional behavior by discussing colleagues and students in public.

■ Plaintiff claims that his favorable review in March of 1999, only two months before the review letter of May 27, 1999, demonstrates that defendant's proffered reasons for the negative review are a pretext for discrimination. A change in management's evaluation of employee performance, however, does not by itself raise an inference of pretext. *See Aquilino v. Univ. of Kan.*, 83 F.Supp.2d 1248, 1256 (D.Kan.2000); *Valdivia v. Univ. of Kan. Med. Ctr.*, 24 F.Supp.2d 1169, 1174 (D.Kan.1998); *see also Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 717–18 (2d Cir.1994) (rejecting inference of discrimination or pretext from negative performance review after prior positive reviews); *Orisek v. Am. Inst. of Aeronautics and Astronautics*, 938 F.Supp. 185, 188 (S.D.N.Y.1996) (same), *aff'd*, 162 F.3d 1148, 1998 WL 650257 (2d Cir.1998). "To hold otherwise would be to hold that things never change, a proposition clearly without a basis in reality." *Shabat v. Blue Cross Blue Shield*, 925 F.Supp. 977, 988 (W.D.N.Y.1996) (internal quotations and citation omitted), *aff'd*, 108 F.3d 1370, 1997 WL 138836 (2d Cir.1997). Moreover, the specific action complained of in the tenure review letter, *i.e.* plaintiff's refusal to serve as concertmaster in the SEK Symphony, occurred after plaintiff's evaluation on March 1, 1999. Accordingly, no reasonable jury could find from plaintiff's prior favorable evaluation that the stated reasons for the negative review letter of May 27, 1999 are a pretext for discrimination.

Plaintiff also claims that PSU's stated reason that he refused to participate in the SEK Symphony is a pretext for discrimination because other faculty members received positive evaluations even though they participated fewer times in the SEK Symphony. Plaintiff, however, was the only faculty member who was required to serve as concertmaster in the SEK Symphony. Even if PSU unfairly required

only one professor to participate regularly in the SEK Symphony, PSU imposed such a requirement before it hired or even interviewed plaintiff. *See* Notice Of Vacancy, Exhibit AA to *Plaintiff's Decl.* (Doc. # 133). Accordingly, the requirement cannot be a pretext for national origin discrimination.

Plaintiff has not offered evidence from which a reasonable jury might conclude that defendant's stated reasons are unworthy of credence. Therefore the Court sustains defendant's motion for summary judgment as to plaintiff's claim of disparate treatment based on the second year tenure review letter dated May 27, 1999.

## 2. Plaintiff's Performance Appraisal Dated March 1, 2000

■ Plaintiff argues that PSU discriminated by giving him a negative performance appraisal for 1999. PSU's stated reasons for the negative appraisal are (1) plaintiff recruited a student in violation of the Code of Ethics of NASM, the music department's accrediting agency, and plaintiff did not tell Patterson the truth when she questioned him about the incident; (2) plaintiff played with the Memphis Symphony from January through May of 1999, but did not request permission to do so and the activity took plaintiff away from classes for several days throughout the semester; and (3) plaintiff declined service in the SEK Symphony even after the chairperson had asked him to play in a single concert which required only two rehearsals.

Plaintiff claims that defendant's first stated reason, *i.e.* the recruiting incident, is unworthy of credence because (1) he was an excellent teacher who had a very heavy workload such that one mistake should not significantly lower his rating, (2) NASM does not have a record of any recruiting violation and (3) plaintiff was the only faculty member who was required to serve as concertmaster in the SEK Symphony. As to plaintiff's first argument, the Court cannot second guess defendant's evaluation of the significance of the one recruiting violation. *See Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1318 (10th Cir.1999) (relevant inquiry is not whether employer's reasons were wise, fair or correct, but whether employer honestly believed those reasons and acted in good faith upon those beliefs). As to plaintiff's second argument, plaintiff admitted that he recruited Ni Mei and that he lied to Patterson about the incident. The fact that NASM does not have a record of the violation does not suggest that the violation did not take place or that plaintiff did not lie to Patterson. Finally, as noted, PSU had the SEK Symphony requirement before it hired plaintiff, so the requirement itself cannot be evidence of pretext.

■ Plaintiff claims that defendant's second stated reason, *i.e.* that he played in the Memphis Symphony without permission, is unworthy of credence because (1) he is an excellent performer; (2) he covered his classes when he was gone; and (3) other faculty members who did not receive permission from the chair received higher ratings on their evaluations. The performance appraisal does not directly criticize plaintiff's ability as a musician. Therefore plaintiff's ability as a musician does not suggest pretext. Plaintiff argues that he always covered his classes by substitute or "by assignments," but he does not deny Patterson's statement in the evaluation that "there is no record that [plaintiff] requested permission to engage in this activity, which would take [him] away from the campus and [his classes] for several days throughout the semester." Exhibit N to *Plaintiff's Decl.* (Doc. # 133). Finally, plaintiff asserts generally that other faculty members engaged in similar conduct but did not receive low performance

ratings. A plaintiff who wishes to show that his employer acted contrary to unwritten policy or practice often does so by providing evidence that he was treated differently from similarly-situated employees who violated work rules of comparable seriousness. *Kendrick,* 220 F.3d at 1230. An employee is similarly situated if the employee deals with the same supervisor and is subject to the "same standards governing performance evaluation and discipline." *Id.* at 1232 (quoting *Aramburu,* 112 F.3d at 1404). In determining whether employees are similarly situated, a court should compare relevant employment circumstances such as work history and company policies. *Id.* Other than his conclusory statements, plaintiff has failed to offer evidence that other employees who engaged in similar behavior were treated differently than he was treated. *See Jones v. Denver Post Corp.,* 203 F.3d 748, 753 (10th Cir.2000).

Plaintiff claims that defendant's final stated reason, *i.e.* that he refused to play in one concert for the SEK Symphony, is unworthy of credence because he was the only faculty member subject to a mandatory requirement to serve as concertmaster for the SEK Symphony. As explained above, such a requirement may have been unfair but PSU created it before plaintiff was even hired for the position. Accordingly, defendant's decision to enforce the requirement by itself cannot establish pretext.

For these reasons, the Court sustains defendant's motion for summary judgment as to plaintiff's claim of disparate treatment based on his 1999 performance appraisal dated March 1, 2000.

### 3. Plaintiff's Non–Renewal As Assistant Professor

On May 15, 2000, Bryant notified plaintiff that, as recommended by the Chair of the Department of Music (Patter-son) in consultation with the Dean of the College of Arts and Sciences, PSU would not continue his employment beyond May 12, 2001. In its memorandum in support of its motion for summary judgment, PSU asserts that it did not renew plaintiff's contract because of "his attitude, his failure to fulfill his job responsibilities and lying to the Music Chairperson about his involvement in the recruitment of a student." Defendant's *Motion For Summary Judgment And Memorandum In Support* (Doc. # 119) filed February 20, 2003 at 13. Because these reasons merely summarize those in the letter which Patterson sent to Bryant, recommending that PSU not renew plaintiff's contract beyond the 2000–01 academic year, the Court examines the letter itself. The letter offers the following reasons for Patterson's recommendation not to renew plaintiff's contract: (1) serious issues of collegiality and professional judgment, raised in plaintiff's second year tenure review letter; (2) plaintiff's recruitment of Ni Mei and his lies to Patterson about the incident; (3) after the incident involving Ni Mei, his offer of another scholarship to an incoming student without following departmental policy; (4) his average musical skills; (5) his limited scholarly effort; (6) his playing in the Memphis Symphony without ensuring that classes were covered during monthly trips to Memphis; (7) his small contribution to the music department; (8) his failure to satisfactorily supervise the listening lab; and (9) the fact that the Waddill Chamber Music competition which plaintiff coordinated was a very small undertaking, compared to festivals which other faculty members managed. *See* Exhibit CC to *Plaintiff's Decl.* (Doc. # 133). As to the second year tenure review letter and the recruitment of Ni Mei, for reasons outlined above, plaintiff has not shown pretext. Plaintiff has not offered evidence to dispute defendant's claim that after the in-

cident involving Ni Mei, he recruited another student in violation of departmental policy. As to plaintiff's ability as a musician, his scholarly effort, his contribution to the music department, his supervision of the music lab and the insignificance of the Waddill Chamber Music Competition, plaintiff disagrees with Patterson's assessment. He has not offered evidence, however which suggests that Patterson did not honestly hold these beliefs. *See Reynolds v. Sch. Dist. No. 1. Denver, Colo.*, 69 F.3d 1523, 1535 (10th Cir.1995) (pretext requires showing that tendered reason was not genuine motivating reason, but was disingenuous or sham); *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) (in a pretext case "[it is] the perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance"). As to plaintiff's participation in the Memphis Symphony, plaintiff has presented his declaration which states that he always arranged to have his classes covered by a substitute or "by assignments." Plaintiff does not explain what "by assignments" means, but defendant has offered no evidence that plaintiff failed to cover his classes. Plaintiff's declaration is therefore sufficient to suggest that this particular stated reason is unworthy of credence.

Although plaintiff has offered sufficient evidence that one of PSU's stated reasons for not renewing his contract is unworthy of credence, he has not offered sufficient evidence to rebut PSU's other stated reasons. As explained above, a plaintiff generally must proffer evidence that each of the employer's justifications are pretextual. *See Tyler*, 232 F.3d at 814. Plaintiff has not satisfied the limited exception in *Tyler* where an employee "casts substantial doubt on many of the employer's multiple reasons." *Id.* Plaintiff has cast doubt on only one of PSU's stated reasons and no reasonable jury would characterize that doubt as substantial. Accordingly, the Court sustains defendant's motion for summary judgment as to plaintiff's claim of disparate treatment based on PSU's decision not to renew plaintiff's employment beyond May 12, 2001.

As to both his evaluations and PSU's decision not to renew his contract, plaintiff essentially claims that PSU did not properly apply the subjective criteria of teaching, scholarly activity and service, and exercised poor business judgment. The Court agrees with the rationale of other courts regarding the plaintiff's burden to show that academic evaluations result from an unlawful reason:

> [C]ourts must be vigilant not to intrude into [tenure] determination[s], and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to .obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges [or jurors].

*Forsythe v. Bd. of Educ. of Unified Sch. Dist. No. 489*, 956 F.Supp. 927, 933 (D.Kan.1997) (quoting *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980)); *see also Villanueva v. Wellesley College*, 930 F.2d 124, 129 (1st Cir.1991) ("It is not the function of the courts to sit as 'supertenure' committees."); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984) ("where the tenure file contains the conflicting views of specialized scholars, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion."). Although plaintiff has offered his own opinion as to

his qualifications, as well as the positive opinions of several colleagues and students, such evidence is insufficient to show pretext. Patterson and Dean Brill, as well as the tenured faculty, did not share plaintiff's opinion of his qualifications and/or they determined that despite his qualifications, they did not want to renew his contract because of the incidents discussed above. Against this evidence, plaintiff's assertion that he was qualified is insufficient to create a reasonable inference that the proffered reasons for his negative evaluations and non-renewal are pretextual. At most plaintiff has shown that PSU may have misjudged his qualifications or relied on inaccurate information. Such errors, however, are insufficient to establish pretext. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."); *Furr*, 82 F.3d at 988 ("It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [her] own relative performance.") (citations omitted).

## B. Retaliation

Plaintiff alleges that after he raised the issue of discrimination on several occasions, PSU retaliated by (1) giving him a negative tenure review letter in May of 1999, (2) giving him a poor evaluation in March of 2000 and (3) notifying him in May of 2000 that PSU would not renew his employment beyond May of 2001.

In analyzing plaintiff's retaliation claim the Court applies the familiar *McDonnell Douglas* shifting burden of proof, set forth above. In order to establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) he engaged in protected opposition to Title VII discrimination; (2) he suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a casual connection links the protected activity and the adverse employment action. *See Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir.1998); *Thomas*, 111 F.3d at 1513. Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus*, 683 F.2d at 343.

 PSU argues that plaintiff did not engage in protected activity because he never filed a formal complaint under the PSU discrimination grievance procedure. Informal complaints to superiors, however, constitute protected activity. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir.2001); *Pastran v. K–Mart, Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000); *Robbins v. Jefferson County Sch. Dist. R–1*, 186 F.3d 1253, 1258 (10th Cir.1999). Plaintiff states that he raised the "discrimination issue" at a faculty meeting in March of 1999, at a meeting with Dean Brill shortly after the second year tenure review letter in May of 1999, at a meeting with Patterson in August of 1999, in a grievance filed with Bryant and Brill in March and April of 2000, and in a grievance regarding his teaching load, which he filed with Patterson in the spring of 2000.[24]

---

24. In one portion of his declaration, plaintiff describes the "discrimination issue" as follows:

The discrimination issue was that I would be disciplined if I missed one concert no matter how much I contributed to the Southeast Kansas Symphony and no matter the fact that I participated in the Southeast Kansas Symphony more than anyone else in the music department; and that nobody would be disciplined for missing many or all of the Southeast Kansas Symphony concerts and that anyone would be given credit if a faculty member participated in the Southeast Kansas Symphony for one or two times except me; and that all the music

The Court cannot ascertain whether plaintiff specifically referenced national origin in any of these meetings or complaints,[25] but plaintiff at least conveyed his view that PSU discriminated against him. *See Verstraete v. Farmers Ins. Co.*, No. 93–2403–KHV, 1994 WL 373890, at *4 (D.Kan. July 11, 1994) (employees often do not speak with clarity or precision of lawyers and for reasons of discretion, tact, security or otherwise do not always brazenly lodge direct allegations of discrimination; relevant question is whether employee's communications sufficiently conveyed his or her concern that employer acted in an unlawful discriminatory manner). PSU does not deny that plaintiff's comments gave it sufficient notice that plaintiff believed he was being unfairly treated because of his national origin. Accordingly, the Court finds that each of the above actions constitute protected activity. In addition, PSU does not contest that in April or May of 2000, plaintiff invoked the arbitration process with respect to his performance evaluation. PSU does not challenge any other element of plaintiff's prima facie case.

After plaintiff establishes a prima facie case of retaliation, the burden shifts to PSU to offer a legitimate reason for the adverse action. Here, PSU claims that it gave plaintiff negative evaluations and failed to renew his contract for the reasons outlined above. The burden now shifts to plaintiff to show a genuine dispute of material fact as to whether PSU's proffered reasons are pretextual. *See Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1394 (10th Cir.1997). Plaintiff may establish retaliation indirectly, by demonstrating that PSU's stated reasons are unworthy of belief. *See id.* (citing *Murray v. City of*

*Sapulpa*, 45 F.3d 1417, 1421 (10th Cir. 1995)).

## 1. Plaintiff's Second Year Tenure Review Letter Dated May 27, 1999

■ As explained above, plaintiff has not presented sufficient evidence for a reasonable jury to conclude that PSU's stated reasons for the negative tenure review letter are unworthy of credence. The only additional evidence which plaintiff presents in support of his retaliation claim is the proximity in time of the faculty meeting where he raised the "discrimination" issue (March of 1999) and the tenure review letter (May 27, 1999). Close temporal proximity alone does not create a disputed issue of fact as to pretext. *See Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1260 (10th Cir.2001); *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir.2000); *see also Conner*, 121 F.3d at 1397 (retaliation under Fair Labor Standards Act); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1180 (10th Cir.1999) (retaliation under ADA). The two month time period is insufficient, by itself, for a reasonable jury to conclude that the fact that plaintiff spoke about "discrimination" at a faculty meeting more likely motivated PSU than the reasons stated in the tenure review letter.

## 2. Plaintiff's Performance Appraisal Dated March 1, 2000

As explained above, plaintiff has not presented sufficient evidence for a reasonable jury to conclude that PSU's stated reasons for the negative performance appraisal are unworthy of credence. In addition, the proximity in time of any protected activity

---

faculty members were Caucasian and I was the only Chinese.
*Plaintiff's Decl.* (Doc. # 133) ¶ 28.

**25.** In the grievance which plaintiff filed with Brill on March 15, 2000, plaintiff stated in

part: "I came from a different cultural background, and I am an American citizen. I would like to be treated equally like everyone else in PSU music department." Zhou Depo. Exh. 5 at 12.

is remote. Plaintiff complained to Patterson in August of 1999—some six months before the negative performance appraisal.[26] In sum, plaintiff has not presented sufficient evidence for a reasonable jury to conclude that defendant's offered reasons are unworthy of credence, *see supra*, or that retaliation for his comments about discrimination—months earlier—more likely motivated PSU than the reasons stated in the performance appraisal.

### 3. Plaintiff's Non–Renewal As Assistant Professor

As explained above, plaintiff has not presented sufficient evidence for a reasonable jury to conclude that PSU's stated reasons for not renewing his employment contract are unworthy of credence. Plaintiff did present sufficient evidence, however, for a reasonable jury to conclude that one of defendant's stated reasons, *i.e.* plaintiff did not arrange for someone to cover his classes while he played in the Memphis Symphony, is unworthy of credence. In addition, as to his retaliation claim, plaintiff has shown that he engaged in protected activity throughout March, April and May of 2000. Despite plaintiff's protected activity during the spring of 2000, both the second year tenure review letter and the performance appraisal in March of 2000 outlined many of the concerns outlined in Patterson's recommendation in May of 2000. Because Patterson had highlighted these concerns before plaintiff's protected activity in the spring of 2000, the close temporal proximity is insufficient by itself to suggest that retaliation more likely mo-

tivated PSU than the reasons outlined in Patterson's letter of May 2, 2000. *See Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1218 (D.Kan.2001).

For these reasons, the Court sustains defendant's motion for summary judgment as to plaintiff's retaliation claims.

### C. Breach of Contract

▇▇▇▇ Plaintiff alleges that defendant breached his employment contract by (1) intentionally discriminating against plaintiff; (2) intentionally targeting plaintiff; (3) intentionally damaging the relationship between PSU and plaintiff; (4) intentionally using an unfair and discriminatory evaluation process to target plaintiff; (5) intentionally depriving plaintiff of arbitration rights under the agreement between PSU and PSU/KNEA; and (6) forcing plaintiff to bear a heavier workload. Plaintiff does not point to specific contractual provisions which PSU violated, but he claims that PSU breached an implied covenant of good faith and fair dealing. *See* plaintiff's *Opposition To Motion For Summary Judgment* (Doc. # 132) filed March 11, 2003 at 23–24. PSU does not address plaintiff's argument. Accordingly, for purposes of PSU's motion for summary judgment, the Court assumes that plaintiff can establish that PSU violated such a covenant.[27]

▇▇▇ PSU argues that even if plaintiff can establish that it breached the employment contract, plaintiff cannot prove that he suffered damages on account of that breach. Plaintiff states that he suffered damages because (1) if he had stayed at

---

**26.** Sometime in the spring of 2000, plaintiff also filed a grievance with Patterson regarding his teaching load. Plaintiff has not provided the details of the grievance or shown that he filed the grievance before his review on March 1, 2000.

**27.** The Court also assumes that the covenant applies to plaintiff's employment contract.

Kansas law does not imply a covenant of good faith and fair dealing in at-will employment contracts, *see Morriss v. Coleman Co., Inc.*, 241 Kan. 501, 738 P.2d 841 (Kan.1987), but neither party addresses whether this principle applies to the contract here. Because only a portion of the contract is part of the record, the Court declines to address this issue.

PSU for one more year, he would have received tenure for his excellent teaching and contributions to PSU, and (2) his termination damaged plaintiff's wife's career as a musician and music educator. *See* plaintiff's *Opposition To Motion For Summary Judgment* (Doc. # 132) filed March 11, 2003 at 25. As to an award of tenure, plaintiff has presented sufficient evidence from which a reasonable jury might conclude that absent defendant's alleged breach of the covenant of good faith and fair dealing, he would have stayed at PSU one more year and received tenure.[28] Plaintiff's wife apparently held a part-time job at PSU, but left her position when plaintiff did so in June of 2000. Plaintiff cannot recover for damage to his wife's career; she is not a party to this lawsuit and he has not shown that she was an intended beneficiary of his employment contract. *See Gray v. Manhattan Med. Ctr., Inc.*, 28 Kan.App.2d 572, 580, 18 P.3d 291, 298 (2001) (two types of third-party beneficiaries—intended and incidental; only intended beneficiaries can sue for damages). The Court sustains defendant's summary judgment motion on this issue.[29] Because plaintiff has presented evidence from which a reasonable jury could find damages because of defendant's breach of the covenant of good faith and fair dealing, the Court overrules in part defendant's motion for summary judgment on plaintiff's breach of contract claim.

**IT IS THEREFORE ORDERED** that defendant's *Motion For Summary Judgment And Memorandum In Support* (Doc. # 119) filed February 20, 2003 be and hereby is **SUSTAINED in part**. The Court overrules defendant's motion for summary judgment as to (1) plaintiff's claim that PSU assigned him a heavy workload without additional pay because of his national origin and (2) plaintiff's claim that PSU breached the implied covenant of good faith and fair dealing. The Court sustains defendant's motion as to all of plaintiff's remaining claims.

**IT IS FURTHER ORDERED** that plaintiff's *Motion For Relief, Motion For Reconsider, Motion For Sanction* (Doc. # 117) filed February 12, 2003 be and hereby is **SUSTAINED in part**. Plaintiff's motions for relief and to reconsider are sustained. Plaintiff's motion for sanctions is overruled.

**IT IS FURTHER ORDERED** that the award of fees and expenses which defendant incurred because of plaintiff's failure to attend three scheduled depositions, *see Memorandum And Order* (Doc. # 114), be and hereby is **VACATED**.

**IT IS FURTHER ORDERED** that defendant's *Motion For Attorney Fees And Memorandum In Support* (Doc. # 121) filed February 21, 2003 be and hereby is **OVERRULED as moot**.

**IT IS FURTHER ORDERED** that plaintiff's *Motion For Extension Of Time* (Doc. # 130) filed March 6, 2003 be and hereby is **SUSTAINED**.

The Clerk is directed to fax a copy of this Memorandum and Order to plaintiff and defense counsel.

28. Defendant does not argue that plaintiff failed to plead this specific form of damages. Liberally construing the pretrial order, however, plaintiff claims in part that PSU should have awarded him tenure after the 2000–01 academic year.

29. Defendant also argues that it complied with the one-year notice provision of the contract. Plaintiff has not responded on this issue. To the extent plaintiff alleges that defendant violated the notice provisions of the employment contract, the Court sustains defendant's summary judgment motion.